1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**

8          **CENTRAL DISTRICT OF CALIFORNIA**

9

10   CYNTHIA E. SPANN, on behalf of            )   Case No. SA CV 12-0215 FMO (RNBx)
     herself and others similarly situated,   )
11                                             )
                     Plaintiffs,               )
12                                             )   **ORDER RE: MOTION FOR CLASS**
           v.                                  )   **CERTIFICATION**
13                                             )
     J.C. PENNEY CORPORATION, a                )
14   Delaware Corporation, et al.,             )
                                               )
15                   Defendants.               )
                                               )
16   _____

17         Having reviewed and considered all the briefing filed with respect to plaintiff's Third Motion

18   for Class Certification ("Motion"), and concluding that oral argument is not necessary to resolve

19   the Motion, see Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684

20   n. 2 (9th Cir. 2001), the court rules as follows.

21                                **INTRODUCTION**

22         Plaintiff Cynthia Spann ("plaintiff") filed this action, individually and on behalf of others

23   similarly situated, against J.C. Penney Corporation, Inc. ("JCPenney" or "defendant") on February

24   8, 2012.  Plaintiff seeks to establish liability "against J.C. Penney for falsely advertising 'original'

25   prices, 'sale' prices and corresponding price discounts for its private branded and exclusive

26   branded apparel and accessories."  (Fourth Amended Complaint ("4AC") at ¶ 1).  Plaintiff alleges

27   that during the Class Period (defined below), defendant "advertised false former prices and false

28   price discounts for its private branded and exclusive branded apparel and accessories."  (See id.).

Defendant filed a Motion to Dismiss, or Alternatively Strike Certain Allegations In [] the Fourth Amended Complaint ("Motion to Dismiss"), which the court denied on March 17, 2015. Accordingly, the 4AC is the operative complaint.  The 4AC alleges violations of California's: (1) Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (2) False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq.; and (3) Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq. (See 4AC at ¶¶ 56-90).  Plaintiff seeks injunctive relief, restitution, and statutory damages.  (See id. at 26-27, Prayer for Relief).

Plaintiff's Motion seeks an order certifying the following class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure[1]:  "All persons who, while in the State of California and between November 5, 2010 and January 31, 2012 (the 'Class Period') purchased from [JCPenney] one or more private or exclusive branded items of apparel or accessories advertised at a discount of at least 30% off of the stated 'original' or 'regular' price, and who have not received a refund or credit for their purchase(s)."  (Joint Briefing Re:  Plaintiff's Third Motion for Class Certification ("Joint Brief") at 1-2).  Should the court determine that class treatment is not appropriate for issues related to remedies, plaintiff proposes, in the alternative, that the court "bifurcate issues under Rule 23(c)(4) and certify a liability-only class[.]" (See id. at 42). Plaintiff also seeks to be appointed class representative and to have her counsel, Stanley Law Group and Emge & Associates, appointed as Class Counsel.  (See id. at 2).

## BACKGROUND

This case arises from plaintiff's March 5, 2011, visit to a JCPenney store in Brea, California. (See 4AC at ¶ 18).  During that visit, "in reliance on Defendants' false and deceptive advertising, marketing and pricing schemes, [plaintiff] purchased over $200.00 in private branded and exclusive branded apparel and accessories[.]"  (Id.).  Private brands are brands that JCPenney owns, designs, and develops, and exclusive brands are outside brands that are sold exclusively at JCPenney.  (See Joint Evidentiary Appendix ("Joint App'x"), Exhibit ("Exh.") 1.C, Deposition of Lorraine Hitch ("Hitch Depo.") at 26).  Plaintiff alleges that while at the store, she "observed that

---

[1] All "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

J.C. Penney advertised price comparisons on plastic placards above or below each product offered for sale[, and that] [o]ne column showed what was represented to be the 'original' price for each product[, and] [t]he next column showed the 'sale' price of each item."  (4AC at ¶ 26).  Plaintiff "[b]eliev[ed] she was able to pay significantly less than what certain products were worth and normally sell for in the retail marketplace, [and was thereby] induced to purchase ten different items, all of which were offered at prices significantly lower than their stated original prices." (Id.).  Plaintiff "purchased private branded apparel . . . and exclusively branded accessories . . . after relying on [defendant's] false discounts and false 'original' former prices for such products." (Id.).

Plaintiff's purchases, based on defendant's alleged "misrepresentations and false and deceptive advertising, [included] . . . three East Fifth blouses, a private brand of J.C. Penney.  All three blouses contained labels representing them to have original prices of $30.00 and discounts of $12.01, leaving a purchase price or [supposed] 'deal' at $17.99." (4AC at ¶ 27).  Further, "upon check-out on March 5, 2011, J.C. Penney provided Plaintiff with a sales receipt containing the same misrepresentations regarding false original prices and price reductions on the East Fifth blouses." (Id. at ¶ 28).  Plaintiff "believed and relied on [defendant's representation] that she [received] 40% off the original price[,] and that [the blouses] regularly sell in the retail marketplace for $30.00."  (Id. at ¶ 27).  However, the "purported 'original' prices and corresponding . . . reductions and savings were false and deceptive, as the prevailing retail price for the East Fifth blouses during the three months immediately prior to [her] purchase . . . was no more than $17.99, and not the [advertised] $30.00 'original' price[.]" (Id.).

Plaintiff alleges that she also purchased other exclusive and private branded items on March 5, 2011, based on similar misrepresentations regarding their original and reduced sale prices, and that the receipt tendered by defendant restated the misrepresentations.  (See 4AC at ¶¶ 29-34).  According to plaintiff, her "reliance upon Defendant's false price comparison advertising was . . . reasonable, [and] . . . entirely intended by" defendant, (id. at ¶ 35), and she has "suffered economic injury as a result[.]" (Id. at ¶ 29).

Plaintiff alleges that defendant's "false price advertising scheme [was] disseminated to California consumers via its in-store display advertising, print advertising and Internet Web site

1    (www.jcpenney.com), [and] was rampant throughout California as part of a . . . pervasive

2    campaign . . . across all of J.C. Penney's private . . . and exclusive branded apparel and

3    accessories until February 1, 2012."  (4AC at ¶ 5).

4         After February 2012, defendant "began a new pricing strategy known as 'fair and square,'

5    by which it purported to offer products at everyday low prices."  (4AC at ¶ 6).  According to plaintiff,

6    however, defendant's "false and deceptive comparative pricing scheme" only "temporarily stopped"

7    in February 2012.  (See id.).  Plaintiff alleges that defendant "largely abandoned its 'fair and

8    square' pricing strategy in early 2013.  Since then, it has experimented with a variety of pricing

9    practices, including a return to false comparative price advertising."  (Id. at ¶ 7).  Specifically,

10   "[defendant] marked up . . . the prices of many of its private and exclusive branded apparel and

11   accessories, well above the former 'fair and square' prices and well above the prevailing market

12   price for such items, without any good faith intention of selling such items . . . at those higher

13   prices."  (Id.).  In essence, plaintiff claims, "for at least some private and exclusive branded

14   products, [defendant] is now using the exact same (or at least materially indistinguishable) false,

15   misleading and illegal comparative pricing practices that it used prior to February 1, 2012."  (Id.

16   at ¶ 41).

17                                        **LEGAL STANDARD**

18        This court has "broad discretion to determine whether a class should be certified, and to

19   revisit that certification throughout the legal proceedings before the court."  Armstrong v. Davis,

20   275 F.3d 849, 871 n. 28 (9th Cir. 2001), cert. denied, 537 U.S. 812 (2002), abrogated on other

21   grounds by Johnson v. California, 543 U.S. 499, 125 S.Ct. 1141 (2005).  The court need only form

22   a "reasonable judgment" on each certification requirement "[b]ecause the early resolution of the

23   class certification question requires some degree of speculation[.]"  Gable v. Land Rover N. Am.,

24   Inc., 2011 WL 3563097, *3 (C.D. Cal. 2011) (internal quotation marks omitted).

25        Rule 23 permits a plaintiff to sue as a representative of a class if:

26             (1) the class is so numerous that joinder of all members is impracticable;

27             (2) there are questions or law or fact common to the class;

28

(3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests

of the class.

Fed. R. Civ. P. 23(a).  Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]"  Mazza v. American Honda Motor Co. Inc., 666 F.3d 581, 588 (9th Cir. 2012).

In addition to fulfilling the four prongs of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b).  See Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548 (2011).  Here, plaintiff seeks class certification under Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the Rule[.]"  Dukes, 131 S.Ct. at 2551 (internal quotation marks omitted).  A court must conduct a "rigorous" class certification analysis.  Id.  On occasion, this analysis "will entail some overlap with the merits of the plaintiff's underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the pleadings[.]"  Id. (internal quotation marks omitted).  However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,133 S.Ct. 1184, 1194-95 (2013) ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied."); see Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n. 8 (9th Cir. 2011) (the district court may examine the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims.  To hold otherwise would turn class certification into a mini-trial.") (citations omitted).

## **DISCUSSION**[2]

I.  **EVIDENTIARY OBJECTIONS.**

On a motion for class certification, "evidentiary rules unrelated to expert testimony are not applied with rigor" because the court does not make findings of fact or ultimate conclusions on plaintiff's claims.  See Cholakyan v. Mercedes-Benz, USA, LLC, 281 F.R.D. 534, 550 (C.D. Cal. 2012); see also Arredondo v. Delano Farms Co., 301 F.R.D. 493, 504 (E.D. Cal. 2014) ("[W]hile the Court shall discuss in detail . . . [the] presentation of conflicting evidence, the analysis of the evidence is merely to determine issues related to certification."); Gonzalez v. Millard Mall Services, Inc., 281 F.R.D. 455, 459 (S.D. Cal. 2012).  Accordingly, the court may consider evidence that may not be admissible at trial on a motion for class certification.  See Gonzalez, 281 F.R.D. at 459.  The court addresses the parties' objections to non-expert testimony below to the extent it deems necessary but does not address objections pertaining to facts it did not consider or deems irrelevant to resolution of the Motion.

First, the court considers defendant's challenges, under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993), to the testimony of plaintiff's expert, Brian J. Bergmark ("Mr. Bergmark").  (See Defendant J.C. Penney Corporation, Inc.'s Objections to Declaration of Brian J. Bergmark ("Bergmark Objection") at 2-6; Joint Brief at 39 n. 29)  Under Federal Rule of Evidence 702,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of
>
> fact to understand the evidence or to determine a fact in issue, a witness

---

[2] On March 18, 2015, the court issued an order denying defendant's Renewed Motion for Summary Judgment ("Motion for Summary Judgment").  (See Court's Order of March 18, 2015). Much of defendant's Motion for Summary Judgment was devoted to plaintiff's proposed remedies – restitution in particular – and defendant's assertions that plaintiff's proposed methods for calculating restitution fail as a matter of law.  (See Motion for Summary Judgment at 1). Defendant makes many of the same arguments in the Joint Brief regarding class certification. (See, e.g., Joint Brief at 29-33, 34-37, 38-42).  However, the court determined that contrary to defendant's assertions, plaintiff is entitled to present her proposed methods of restitution, so long as each is measurable and supported by evidence.  (See Court's Order of March 18, 2015, at 7). Because the court has already decided this issue, this Order will not address the portions of the Joint Brief dedicated to such arguments.  To the extent any of the proposed calculation methods bear on class certification, they are addressed below.

qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see United States v. Finley, 301 F.3d 1000,1007 (9th Cir. 2002) ("[Federal Rule of Evidence 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion."). Prior to the evaluation of those three requirements, however, Daubert holds that a trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796.

"[A]t the class certification stage, district courts are not required to conduct a full Daubert analysis." Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 495 (C.D. Cal. 2012) (analyzing Ninth Circuit case law regarding evidentiary standards for class certification post-Dukes). "Rather, district courts must conduct an analysis tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance." Id. In doing so, the "'requirements of relevance and reliability set forth in Daubert . . . serve as useful guideposts but the court retains discretion in determining how to test reliability as well as which expert's testimony is both relevant and reliable." Id. (citing Ellis v. Costco Wholesale Corp., 240 F.R.D. 627, 635-36 (N.D. Cal. 2007), affirmed on this point by Ellis, 657 F.3d at 982)). "At this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." Id. (internal quotation marks omitted). With these "guideposts" in mind, see Tait, 289 F.R.D. at 495, the court turns to the expert testimony at issue in this case.

Mr. Bergmark is the Managing Director and one of the Founders of Torrey Partners, an economic and accounting services firm.  (See Declaration of Brian J. Bergmark in Support of Plaintiff's Motion for Class Certification Dated April 11, 2013, ("Bergmark Decl.") at ¶ 2).  He is licensed as a Certified Public Accountant and is accredited in Business Valuation by the American Institute of Certified Public Accountants and as a Senior Appraiser by the American Society of Appraisers.  (See id.).  He has approximately 30 years of experience in the field of valuation and accounting services.  (See id. at ¶ 3).  Plaintiff relies on his testimony for a number of issues related to class certification, including whether defendant's sales data can be analyzed on a class-wide basis to evaluate alleged violations of the FAL, (see Joint Brief at 18), whether defendant's sales data renders its CLRA claim susceptible to common proof, (see id. at 22), and whether plaintiff's proposed measures for calculating restitution are viable in the class action context.  (See id. at 27).

Defendant raises two objections to Mr. Bergmark's testimony, both of which are related to the principles and methodology he employed.  (See Bergmark Objection at 2-6).  First, defendant asserts that Mr. Bergmark's identification of the prevailing market price for the items plaintiff purchased as the "most commonly occurring (or [p]revalent) actual sales price by item using JCPenney's in-store data" is unreasonable and unsupportable.  (See id. at 2-3) (internal quotation marks omitted).  It argues that Mr. Bergmark cannot possibly calculate the prevailing market price for each item "solely by reference to sales prices at JCPenney stores[.]"  (See id. at 3).  Defendant's assertions are unpersuasive.

In light of the court's discussion below regarding the meaning of "prevailing market price," the court is persuaded that  Mr. Bergmark's analysis of JCPenney's sales data is reasonable and supportable.  See infra at § II.B.1.c.; see, e.g., In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 492 (9th Cir. 2008) (expressing a preference for expert opinions that "submit[] a functioning model that is tailored to market facts in the case at hand.") (internal quotation marks omitted).  JCPenney's large volume of sales data for its own products is undoubtedly a reasonable and supportable method by which to determine the prevailing market price of products that are available only in its stores.  Accordingly, the court finds that Mr. Bergmark's "JCPenney-only

market" is neither arbitrary nor unreasonable, and defendant's objection on this ground is overruled.

Defendant's second objection to Mr. Bergmark's methodology is that he "equates the prevailing market price to be the most commonly occurring (or [p]revalent) actual sales price by item." (Bergmark Objection at 5) (internal quotation marks omitted). In other words, he identified "mode" as the proper measure of "prevailing" in "prevailing market price" as opposed to the mean or some other metric. (See id.). Defendant asserts that Mr. Bergmark justified his selection of the mode based on his interpretation of Cal. Bus. & Prof. Code § 17501, and that "[s]uch an interpretation is improper, as experts may not opine on the meaning of the law." (Bergmark Objection at 6).

Defendant's objection does not go to whether there are common questions of law or fact among the putative class members. Whether prevailing market price is determined by reference to the mode or mean price for each item, the method by which Mr. Bergmark will perform his calculations, i.e., comparing purchase prices to prevailing market prices, will not change. Defendant has not proposed an alternative measure that would render the calculation an inherently individualized one. (See, generally, Joint Brief, Bergmark Objection). Without any indication that this measure impacts class certification, (see Joint App'x, Exh. 1.R, Deposition of Brian J. Bergmark at 236) ("I can perform that analysis once I have the data available to me because I have the computer tools to allow me to do that, and it's not much more difficult for me to do thousands of transactions as compared to ten transactions"), this is not a dispute that must be resolved at this time "to determine whether there was a common pattern and practice that could affect the class as a whole." Ellis, 657 F.3d at 983.

II.    CLASS CERTIFICATION.

    A.    Rule 23(a) Requirements.

        1.    **Numerosity.**

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." Harris v. Palm Springs Alpine

1  Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotation marks omitted).  "In

2  determining whether numerosity is satisfied, the court may consider reasonable inferences drawn

3  from the facts before it." Balasanyan v. Nordstrom, Inc., 294 F.R.D. 550, 558 (S.D. Cal. 2013).

4       Defendants do not challenge this factor, (see Joint Brief at 16), and the court finds that it

5  is easily satisfied given that the putative class action includes a large number of consumers who

6  purchased private branded and exclusive branded items during the Class Period.  (See, e.g.,

7  Bergmark Decl. at ¶¶ 15 and 16(b)).

8         **2.    Commonality.**

9       The commonality requirement is satisfied if "there are common questions of law or fact

10  common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires plaintiff to demonstrate that

11  her claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue

12  that is central to the validity of each one of the claims in one stroke." Dukes, 131 S.Ct. at 2551;

13  see also Wolin v. Jaguar Land Rover North America, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010)

14  (The commonality requirement demands that "class members' situations share a common issue

15  of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims

16  for relief.") (internal quotation marks omitted).  "The plaintiff must demonstrate the capacity of

17  classwide proceedings to generate common answers to common questions of law or fact that are

18  apt to drive the resolution of the litigation." Mazza, 666 F.3d at 588 (internal quotation marks

19  omitted).  "This does not, however, mean that every question of law or fact must be common to

20  the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." Abdullah

21  v. U.S. Security Associates, Inc. 731 F.3d 952, 957 (9th Cir. 2013), cert. denied, 135 S.Ct. 53

22  (2014) (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589

23  (characterizing commonality as a "limited burden[,]" stating that it "only requires a single significant

24  question of law or fact[,]" and concluding that it remains a distinct inquiry from the predominance

25  issues raised under Rule 23(b)(3).  Proof of commonality under Rule 23(a) is "less rigorous" than

26  the related preponderance standard under Rule 23(b)(3). See Mazza, 666 F.3d at 589; Hanlon

27  v. Chrysler Corp., 150 F.3d 1011, 1019-20 (9th Cir. 1998). "The existence of shared legal issues

28

with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon, 150 F.3d at 1019.

"District courts in California routinely certify consumer class actions arising from alleged violations of the CLRA, FAL and UCL." Tait, 289 F.R.D. at 480 (collecting cases).  This case is one of those routine cases.  Although only one common question of law or fact is needed, this case presents a number of common questions of law or fact that "drive the resolution" of the claims of the putative class.  For example, common questions include, but are not limited to: (1) whether defendant's price-comparison advertising scheme regarding its private and exclusive branded apparel and accessories was false or misleading within the meaning of the UCL, FAL or CLRA; (2) whether defendant made false statements in its advertisements; (3) whether defendant's advertisements were likely to deceive a reasonable consumer; (4) whether defendant's statements regarding its pricing were material to plaintiffs' purchasing decisions; (5) how to calculate prevailing market price; (6) whether the regular price equaled the prevailing market price for the preceding 90 days in defendant's price-comparison advertising scheme; (7) whether defendant had a bona fide intention of selling a reasonable quantity of its private and exclusive branded apparel and accessories at the regular price; and (8) whether plaintiffs have suffered damages as a result of defendant's conduct.  These common questions of law and fact are susceptible to common proof – that is, testimony by plaintiff and her expert(s) explaining whether the statements in the advertisements were false, as well as documents explicating defendant's pricing policies and data – the "truth or falsity" of which "will resolve an issue that is central to the [claims'] validity[.]"  See Dukes, 131 S.Ct. at 2552.  All of the items at issue have similar key characteristics, including: they are private and exclusive branded items, (see Hitch Depo. at 26), they have price tags that are intended to convey the price at which defendant previously offered the products, (see Joint App'x, Exh. 1.E, Deposition of Adam Tarczynski ("Tarczynski Depo.") at 58-59), and when purchased, a receipt details the price paid and any purported savings.  (See Joint App'x, Exh. 1.H, Copy of J.C. Penney Receipt ("Receipt") at 140). Because the claims of all prospective class members involve the same alleged misrepresentations

1   related to items with these same common characteristics, they are susceptible to common proof
2   sufficient to meet the commonality requirement of Rule 23(a)(2).

3           Defendant argues that "[w]hether a particular item's advertised regular price complies with
4   [legal requirements] or not says nothing about the legality of any other advertising conduct at
5   issue[,]" and therefore, answering any supposed "common questions" does not resolve any issues
6   that are central to the validity of each of the claims. (See Joint Brief at 45). This argument ignores
7   the crux of plaintiff's claims, i.e., that the false advertising was a "scheme" that was "rampant
8   throughout California as part of a massive, years-long, pervasive campaign and was consistent
9   across all of J.C. Penney's private branded and exclusive branded apparel and accessories[.]"
10  (See 4AC at ¶ 5). Plaintiff has already submitted evidence in support of this assertion.[3] (See, e.g.,
11  Joint App'x, Exh. 1.I, Price Pacing Flow Chart ("PPFC") for 4th Quarter 2010 ("4th Quarter 2010
12  PPFC") at 141-46; Supplemental Declaration of Matthew J. Zevin in Support of Plaintiff's Motion
13  for Class Certification, at Exh. U (PPFC for 1st Quarter 2010); id. at Exh. W (PPFC for 4th Quarter
14  2011) (showing that for a number of quarters, no items were offered at regular price). While the
15  trial evidence may concern different private branded items, the common questions of whether
16  defendant's price-comparison advertising scheme resulted in false price comparisons that
17  deceived consumers remains across all of defendant's private and exclusive branded items. If
18  defendant can prove that its price-comparison advertising scheme did not generate false price
19  comparisons that deceived consumers, then it should welcome class certification. By proving that
20  its price-comparison advertising scheme did not generate false price comparisons, defendant can
21  obtain a judgment binding all class members who do not opt out of the class. In short, proof in this
22  case will produce a common answer as to whether defendant's price-comparison advertising
23  scheme resulted in false price comparisons for its private and exclusive branded items. Common
24  proof will advance the litigation by resolving these questions "in one stroke" for all members of the
25  class. See Dukes, 131 S.Ct. at 2551.

26

27

28

---

[3] See infra at § II.B.1 for a more detailed discussion of this evidence.

### 3. Typicality.

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." Wolin, 617 F.3d 1175 (internal quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. (internal quotation marks omitted).

Defendants do not challenge this factor, (see Joint Brief at 16), and the court finds that it is satisfied because plaintiff's claims are based on the same facts and the same legal and remedial theories as the claims of the rest of the class members.

### 4. Adequacy of Representation.

Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit uses a two-prong test to determine whether representation meets this standard: "(1) do the named plaintiff[] and [her] counsel have any conflicts of interest with other class members and (2) will the named plaintiff[] and [her] counsel prosecute the action vigorously on behalf of the class?" Ellis, 657 F.3d at 985 (internal quotation marks omitted). The adequacy of counsel is also considered under Rule 23(g). See Fed. R. Civ. P. 23(g).

Defendants do not challenge this factor (see Joint Brief at 16), and the court finds that it is satisfied. Plaintiff has no known interests antagonistic to the interests of other class members. (See Joint App'x, Exh. 8, Declaration of Cynthia E. Spann in Support of Motion for Class Certification, dated April 9, 2013, at ¶ 3). She has vigorously pursued this action on behalf of the class, participated in discovery, submitted to a full-day deposition, and will testify at trial if necessary. (See id. at ¶¶ 4-7). Further, plaintiff's counsel are experienced class action attorneys, (see Joint App'x, Exh. 1.S, Stanley Iola, LLP Firm Resume at 244-51; Exh. 7.A, Emge & Associates Firm Resume at 422-26), and have prosecuted the action vigorously thus far.

B.    Rule 23(b)(3) Requirements.

Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted). Rule 23(b)(3) requires two different inquiries, specifically a determination as to whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A court evaluating predominance and superiority must consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Id.

       1.    **Predominance.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997). "Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance test], the Rule 23(b)(3) test is far more demanding[.]" Wolin, 617 F.3d at 1172 (internal quotation marks omitted). The "focus is on the relationship between the common and individual issues." In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (internal quotation marks omitted). "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks omitted).

Because the parties make distinct arguments with respect to predominance as applied to liability and remedies, the court addresses liability and remedies separately below. First, however, because it is relevant to the analysis of liability under all of plaintiff's asserted causes of action as well as remedies, the court provides a brief summary of the evidence plaintiff intends to use to prove her claims.

1  Plaintiff refers to defendant's internal pricing guidelines, which are intended as guidance
2  for defendant's buyers, who set regular, original, and sales prices for items in defendant's stores.
3  (See Hitch Depo. at 27; Joint App'x, Exh. 2.1, 2011 Pricing and Promotion Guidelines - Base
4  Guidelines for Price Comparison and Advertising dated 11/10/2010 ("Pricing Guidelines") at 280).
5  Plaintiff asserts that the Pricing Guidelines "fostered deceptive pricing" because "one guideline
6  required that an 'original' price be the price 'at which 5-10% of the item's total initial shipment will
7  be sold[,]" (id. at 268), and another requires a "14-day 'landing period' during which a new item
8  would be offered at a regular price before being marked down." (Id. at 288); (see Joint Brief at 5).
9  At the same time, however, the Pricing Guidelines "allowed discounts, such as 'Buy one Get one
10 at 50% [or more] Off" ("BOGO") during the landing period. (See Pricing Guidelines at 288); (see
11 Joint Brief at 5). Plaintiff intends to show that as a result of these policies, "few, if any, items were
12 ever truly offered or sold at the 'regular' price." (See Joint Brief at 5).

13 Plaintiff also uses defendant's Price Pacing Flow Charts ("PPFC"), which show "each day
14 that an item was offered at a discount[.]" (See, e.g., 4th Quarter 2010 PPFC at 141-46); (see Joint
15 Brief at 5-6). PPFCs "show that buyers routinely set both a regular price, and an initial discounted
16 price in advance of each product's first offering." (See Joint Brief at 6). Plaintiff asserts that these
17 PPFCs show that "only thirteen of the thousand-plus items [offered during four fiscal quarters
18 during the Class Period] were ever offered at the advertised regular price; and those were for a
19 total of only 17 days and coupled with a BOGO discount." (Id.) (emphasis in original). According
20 to plaintiff, "each division was provided a specific margin (or profit) target based on the Company's
21 overall gross profit target[,]" (id. at 8), and "[t]he fact that JCPenney not only meets, but exceeds
22 this target at the first planned sale price further shows that JCPenney did not expect to sell (or
23 care if it sold) products at the higher 'regular' prices." (Id.). Plaintiff claims that defendant's Retail
24 and Advertising Charts support its claims, as they show that "only a fraction of one percent (.2%)
25 of products sold at the regular price[,]" (see Exh. 1.N, Colored Copies of JCP Retail and
26 Advertising Charts at 189; Joint Brief at 9), and "98.7% of the Company's revenues came from
27 products offered at a discount of 30% or more." (Id.).

28

1   Finally, plaintiff "has analyzed [defendant's] sales data from California for every transaction

2   involving the [seven different][4] items purchased by Plaintiff." (Joint Brief at 10).  This  analysis

3   revealed that "four items never sold at the regular price, and all but one transaction was at a

4   discount of 30% or more." (See id. at 10; Bergmark Decl. ¶¶ 9-14, 16(b)) (emphasis in original).

5   The other three items "had nominal sales [2.5%, 1.4%, and .2%] at the regular price[s]." (See

6   Joint Brief at 10; Bergmark Decl. Exh. B).  According to plaintiff, "this analysis confirms that the

7   so-called regular prices were not the prevailing market price for any of the items during any 90 day

8   period." (Joint Brief at 11) (emphasis in original); (Bergmark Decl., ¶¶ 15 and 16(b)).

9   With this evidence in mind, the court turns to each cause of action – and then the requested

10  remedies – to determine whether common questions predominate.  See Abdullah, 731 F.3d at 957

11  (Where plaintiff's claims arise under state law, the court must "look[] to state law to determine

12  whether the plaintiff['s] claims – and [defendant's] affirmative defenses – can yield a common

13  answer that is 'apt to drive the resolution of the litigation.'") (quoting Dukes, 131 S.Ct.  at 2551);

14  Erica P. John Fund, Inc.  v.  Halliburton Co., 131 S.Ct.  2179, 2184 (2011) ("Considering whether

15  questions of law or fact common to class members predominate begins . . . with the elements of

16  the underlying cause of action.") (internal quotation marks omitted).

17                                a.   *Liability under the UCL.*

18  The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus.

19  & Prof. Code § 17200.  Plaintiff brings claims under each of these three prongs.  (See 4AC at ¶¶

20  56-78).  As to the unfair and fraudulent prongs, because the UCL is intended to deter unfair

21  business practices, "relief under the UCL is available without individualized proof of deception,

22  reliance, and injury."  Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1020 (9th Cir. 2011), cert.

23  denied, 132 S.Ct. 1970 (2012).  A claim under the UCL based on false advertising or promotional

24

25  _____

26  ⁴ Mr. Bergmark explains that for purposes of his analysis, "two or more products are essentially
    the same 'item' when they have both the same 'subdivision' and 'lot' numbers assigned[,]
27  regardless of any color or size differences designated" by the remaining digits in the item, or
    "SKU," number.  (See Bergmark Decl. at ¶¶ 11-14).  Although plaintiff purchased ten different
28  items during her visit, Mr. Bergmark's analysis treats them as seven items (with seven different
    combinations of subdivision and lot numbers) for his pricing analysis.  (See id.).

1  practices requires that a plaintiff only "show that members of the public are likely to be deceived"

2  by the defendant's conduct.  In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009) (internal

3  quotation marks omitted).  "'Likely to deceive' . . . indicates that the ad[vertisement] is such that

4  it is probable that a significant portion of the general consuming public or of targeted consumers,

5  acting reasonably in the circumstances, could be misled." Lavie v. Procter & Gamble Co., 105

6  Cal.App.4th 496, 508 (2003).  The court should examine the business practice and its "impact on

7  its alleged victim, balanced against the reasons, justifications, and motives of the alleged

8  wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity

9  of the harm to the plaintiff[.]" Motors, Inc. v. Times-Mirror Co., 102 Cal.App.3d 735, 740 (1980).

10  　　　Plaintiff seeks to prove that defendant's practices are likely to deceive consumers because

11  they do not reflect the true nature of defendant's offering prices.  To prove her claim, plaintiff

12  intends to introduce JCPenney's pricing policies and data.  See supra at § II.B.1.  A jury may

13  determine from such common proof that the scheme was pervasive, and that defendant was or

14  should have been aware that it would deceive customers.  Plaintiff "may also rely on empirical data

15  demonstrating that false price comparisons deceive consumers and influence their purchasing

16  decisions." (Joint Brief at 25).  All of the questions under this prong are subject to common,

17  classwide proof, as the evidence at issue is common to all class members.

18  　　　Plaintiff's claim under the "unlawful" prong incorporates the FAL and the CLRA, and as

19  explained below, common questions predominate with respect to those claims.  Plaintiff's

20  "unlawful" UCL claim also incorporates a claim under the FTCA, (see 4AC at ¶ 73), which prohibits

21  "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1), and

22  specifically prohibits false advertisements.[5]  See 15 U.S.C. § 52(a).  FTC Guides set forth the

23  FTC's interpretation of the types of practices that the FTC regards as unfair or deceptive, and its

24

25  ────────────────

26  　　　[5]  Although the FTCA does not provide an individual cause of action, see, e.g., Carlson v.
   Coca-Cola Co., 483 F.2d 279 (9th Cir. 1973), the California Supreme Court has made clear that

27  Cal. Bus. & Prof. Code § 17200 "borrows violations of other laws and treats these violations, when
   committed pursuant to business activity, as unlawful practices independently actionable." Farmers

28  Ins. Exch. v. Superior Court, 2 Cal.4th 377, 383 (1992) (internal quotation marks omitted).
   Accordingly, plaintiff may use the FTCA as the basis for her UCL claim.

section on "former price comparisons" states that "[i]f the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison."  16 C.F.R. § 233.1(a).  A former price may be fictitious or not bona fide, if "an artificial . . . inflated price was established for the purpose of enabling the subsequent offer of a large reduction[.]"  Id.

To establish liability under this standard, plaintiff has proposed to present the evidence described above.  See supra at § II.B.1.  The Pricing Guidelines, PPFCs, and actual sales data may show that defendant had no bona fide intention of selling the subject products at their "original" or "regular" prices.  See, e.g., B. Sandfield, Inc. v. Finlay Fine Jewelry Corp., 258 F.3d 578, 579-80 (7th Cir. 2001) (stating that less than 3% of total sales at "regular" price indicates a lack of good faith intent to sell the product at that price).  Again, defendant's contention that this claim must be proven on an individual basis ignores the thrust of plaintiff's claim, which is that defendant operated a systematic and pervasive unlawful price comparison policy.  Evidence of such a policy or scheme is common to all putative class members and predominates over any individual facts or questions.

b.  <em>Liability under the CLRA</em>.

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices[.]"  Cal. Civ. Code § 1770(a).  Specifically, it prohibits "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(13).  In general, to bring a CLRA claim, the plaintiff must show that:  (1) the defendant's conduct was deceptive; and (2) that the deception caused defendant to be harmed.  Stearns, 655 F.3d at 1022.  In the class context, a CLRA claim "requires each class member to have an actual injury caused by the unlawful practice."  Id.

California courts often find predominance satisfied in CLRA cases because "causation, on a classwide basis, may be established by materiality, meaning that if the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class[.]"  Tait, 289 F.R.D. at 480 (internal quotation marks and emphasis omitted)(collecting cases).  A misrepresentation is material if "a reasonable man would attach

importance to its existence or nonexistence in determining his choice of action in the transaction in question[.]"  Stearns, 655 F.3d at 1022 (internal quotation marks omitted).  "If the misrepresentation . . . is not material as to all class members, the issue of reliance would vary from consumer to consumer and the class should not be certified."  Id. at 1022-23 (internal quotation marks omitted).

Both prongs of plaintiff's CLRA claim present predominant questions.  First, with respect to defendant's deceptive conduct, plaintiff intends to prove the claim by reference to defendant's pricing policies, guidelines, practices, and actual sales data.  See supra at § II.B.1.  It may be shown from such material that defendant's advertising practices are deceptive, and that inquiry predominates over any individualized issues that arise in connection with the advertisements themselves.  See, e.g., Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976) ("[C]ourts have taken the common sense approach that the class is united by a common interest in determining whether defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions[.]").

Second, because causation may be established by materiality, see, e.g., Tait, 289 F.R.D. at 479, the question of materiality will predominate over individual questions of reliance.  In Amgen, the Supreme Court affirmed the certification of a securities fraud case brought under § 10(b) and Rule 10b-5.  133 S.Ct.  at 1190, 1194 & 1204.  The Court emphasized that the predominance inquiry must focus on common questions that can be proved through evidence common to the class.  See id. at 1195-96.  However, the requirement that common questions predominate over any questions affecting only individual class members, see id. at 1196, does not require a plaintiff class to prove each element of a claim through classwide proof.  As the Amgen Court explained, an inability of the plaintiff class "to prove materiality would not result in individual questions predominating.  Instead, a failure of proof on the issue of materiality would end the case, given that materiality is an essential element of the class members' securities-fraud claims."  Id. at 1191.  The plaintiff class in Amgen was "entirely cohesive: It will prevail or fail in unison.  In no event will the individual circumstances of particular class members bear on the inquiry."  Id.

1   Following Amgen's lead, the court finds that the question of materiality under the CLRA

2   predominates over any individual questions.  Indeed, there may be no individual questions at all,

3   because plaintiff intends to "rely on empirical data demonstrating that false price comparisons

4   deceive consumers and influence their purchasing decisions."  (See Joint Brief at 25).  As in

5   Amgen, the class "will prevail or fail in unison," see 133 S.Ct. at 1191, for the reasons noted

6   above in the Rule 23(a) discussion.  See supra at § II.A.

7                              c.     Liability under the FAL.

8   Under the FAL, "[i]t is unlawful for any person . . . to make or disseminate . . . [an

9   advertisement] . . . which is untrue or misleading, and which is known, or which by the exercise

10   of reasonable care should be known, to be untrue or misleading[.]"  Cal. Bus & Prof. Code § 17500

11   ("§ 17500").  Courts often find that common questions predominate in FAL actions because they

12   call for analysis under an objective reasonable person test.  See Tait, 289 F.R.D. at 481 (collecting

13   cases).

14   Defendant does not argue that predominance is not met with respect to plaintiff's claim

15   under this provision.  (See, generally, Joint Brief).  However, the FAL's specific provision regarding

16   statements as to former price is also at issue in this case.  That provision states that "[n]o price

17   shall be advertised as a former price of any advertised thing, unless the alleged former price was

18   the prevailing market price . . . within three months next immediately preceding the publication of

19   the advertisement[.]"  Cal. Bus. & Prof. Code § 17501 ("§ 17501").

20   Defendant asserts that to properly determine "prevailing market price," plaintiff must

21   analyze each item sold in the market (i.e., by other retailers in the geographic area), not simply

22   the price at which defendant previously offered the items.  (See Joint Brief at 48).  According to

23   defendant, plaintiff must consider "price data from JCPenney and competing retailers at different

24   times in different, numerous local markets throughout California[,]" which "will vary not just by

25   consumer but by item."[6]  (See Joint Brief at 48).  The predominance standard under Rule 23(b)(3),

26

27       [6]  Mr. Bergmark recognizes that "[i]t would be difficult, if not impossible, to determine the
     prevailing market price . . . if it were determined that the price history of other 'similar' products
28   needed to be evaluated as well."  (See Joint App'x Exh. 5, Supplemental Declaration of Brian J.
     Bergmark in Support of Plaintiff's Motion for Class Certification dated July 11, 2013 ("Suppl.

1  in other words, likely would not be met.  Plaintiff argues that because the private and exclusive

2  branded items are sold only in defendant's stores, the relevant market is JCPenney itself, and the

3  "prevailing market price" need only be based on defendant's sales data.  (See id. at 18-20).

4      Under California's FAL, "the worth or value of any thing advertised is the prevailing market

5  price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication

6  of such advertisement in the locality wherein the advertisement is published."  Cal. Bus. & Prof.

7  Code § 17501.  This language does not immediately make clear, in a case involving private and

8  exclusive branded items sold by only one retailer, whether the "market" consists of the market for

9  the items themselves (i.e., the retailer that sells them), as plaintiff argues, or the market for similar

10  items (i.e., other local retailers), as defendant argues.  (See, e.g., Joint Brief at 19-22, 46-48).

11      The parties each rely primarily on one case in support of their positions.  Plaintiff refers to

12  Brazil v. Dell Inc., 2010 WL 5387831, *5 (N.D. Cal. 2010), in which the court analyzed Dell's own

13  prices because "the claims in th[e] case turn[ed] on discounts allegedly from Dell's previously

14  offered prices."  Though the facts in Brazil are similar to this case, the analysis upon which plaintiff

15  relies related to commonality and whether Dell's pricing history was sufficient common evidence.

16  See id.  Brazil did not analyze the meaning of "prevailing market price" under § 17501, and while

17  it approved of comparing Dell's previously offered prices to evaluate falsity of advertisements, it

18  did not conclude that those prices should be deemed the prevailing market price.  See, generally,

19  id.

20      Defendant, on the other hand, relies on Mahfood v. QVC, Inc., 2008 WL 5381088 (C.D. Cal.

21  2008), in which the court, analyzing § 17501, found that in order to establish "Retail Value," plaintiff

22  had to compare the price of a given product from "other retailers in the geographic area[.]"  Id. at

23  *4 (internal quotation marks omitted).  Like Brazil, however, Mahfood does not directly answer the

24  question presented in this case.  In Mahfood, plaintiffs were faced with three different prices:

25  "Retail Value," "QVC Price," and "Introductory Price."  See 2008 WL 5381088, at *1.  In the

26  Mahfood complaint, plaintiff alleged that "[t]he higher marked Retail Value indicates to the

27

28  Bergmark Decl.") at ¶ 16).

1  customer the prevailing market price for the product[,]" but the "Retail Value [wa]s not the

2  prevailing market price for the product[.]"  Id.  She also alleged that the "QVC Price indicates the

3  [regular] price [at which] the product will be sold by Defendant[,]" but that the "QVC Price is not

4  the price Defendant has used recently, if ever, to sell the product."  Id.

5          Here, however, plaintiff alleges that JCPenney's advertisements were false because the

6  "original" price should have been, but was instead greater than, the prevailing market price.  (See,

7  4AC at ¶ 81) ("the private branded and exclusive branded apparel and accessories sold at J.C.

8  Penney did not have a prevailing market price anywhere close to the 'original' price advertised.").

9  In Mahfood, the court asked whether the "Retail Value" was equal to the prevailing market value,

10  and whether the "QVC Price" was equal to the QVC's actual former price.  See 2008 WL 5381088,

11  at *4.  Because "Retail Value" was juxtaposed against the "QVC Price," there was no question that

12  "Retail Value" was meant to refer to prices other than the retailer's own prices.  Here, the concepts

13  are intertwined: we ask whether defendant's former price (its version of Mahfood's "QVC Price")

14  was consistent with the prevailing market price.

15          A third case, not raised by either of the parties, is Faberge, Inc. v. Saxony Products, Inc.,

16  1971 WL 16493 (C.D. Cal. 1971).  Defendant, seller of "Bravado" men's lotion, created a bottle

17  that was intended to look almost identical to a competitor's "Brut" men's lotion.  See id. at *2.  Brut

18  lotion regularly retailed for $6.00, and defendant labeled its Bravado bottle "with a price of $6.00

19  and has advertised . . . that [the lotion] . . . has a value of $6.00."  See id.  The court found that

20  the representations of a $6.00 price violated § 17501 "because said . . . bottle of Bravado lotion

21  has never been sold for anything approaching $6.00[.]"  Id.  Like Brazil, the court did not explicitly

22  analyze the meaning of "prevailing market price."  See, generally, Faberge, 1971 WL 16493.

23  Unlike Brazil, however, the court found a violation of  § 17501, see id. at *3, and in doing so, it

24  analyzed sales for the Bravado brand alone.  See id. at *2.  The court did not address the

25  possibility that the $6.00 price of the very similar Brut lotion (or any other lotion) might factor into

26  the analysis of the prevailing market price of Bravado lotion.  See, generally, id.

27          Defendant also refers to the 1984 Report of the Attorney General's Committee on Sale and

28  Comparative Price Advertising ("AG Committee Report") and Attorney General Opinion No. 57-126

("AG Opinion")[7] in support of its argument that "prevailing market price" must include a comparison of prices of similar items at other retailers.  (See Joint Brief at 47).  The AG Opinion provides examples of comparative advertising scenarios:

> A furniture dealer advertises a mattress as "worth $100" but that he will sell it for $50.  Hence, the adjective "comparative", for the dealer is comparing worth with selling price as an inducement to the purchase. Unless the mattress is actually worth $100, which under section 17501 means that similar mattresses are selling for $100 in the open local market, the advertisement is false and deceptive and the dealer is guilty of a violation.

57 Op. Att'y Gen. 126, 129 (1957) (emphasis added).  This situation, as plaintiff points out, (see Joint Brief at 21), is similar to the alleged misrepresentation in Mahfood, in which an item was represented as selling for less than its "Retail Value."  See Mahfood, 2008 WL 5381088, at *2. For the same reasons, then, this fact pattern is not directly applicable to plaintiff's § 17501 claim.

The second example in the AG Opinion is slightly different:

> The same furniture dealer runs another advertisement which offers a couch which he claims was formerly selling for $100 but is now selling for $50. Unless the price which he advertises as the former price actually coincides with the "prevailing market price" of the couch within the next preceding three months . . . the advertisement is again false and deceptive, and the vendor is within the prohibitions of section 17500.

57 Op. Att'y Gen. at 129.  This is precisely what plaintiff has asserted in its § 17501 claim: that JCPenney's advertised former prices did not coincide with prevailing market prices and are therefore false and deceptive.  (See 4AC at ¶ 81).  Although this example does not define "prevailing market price," the AG Opinion states that the price should be the "prevailing market

---

[7]   The court grants defendant's request for judicial notice of these documents.  See, e.g., Daugherty v. Experian Info. Solutions, Inc., 847 F.Supp.2d 1189, 1193 (N.D. Cal. 2012) (taking judicial notice of opinion letter from state Attorney General), Cent. Delta Water Agency v. United States Fish & Wildlife Serv., 653 F.Supp.2d 1066, 1079 (E.D. Cal. 2009) (noting that California Attorney General opinions are "judicially noticeable" and "persuasive").

1   price" of <u>the</u> couch, as opposed to comparing "<u>similar</u> mattresses" in the first example.  <u>See</u> 57 Op.

2   Att'y Gen. at 129 (emphases added).  If, however, the proper analysis of "prevailing market price"

3   requires consideration of similar items from other retailers, then the distinction between the

4   prevailing market price of "<u>the</u> couch" versus "similar couches" is one without a difference.

5        Noting that  § 17501 "does not . . . defin[e] 'prevailing market price,'" the AG Committee

6   discusses two California Superior Court cases that dealt with the setting of "regular prices."  (<u>See</u>

7   AG Committee Report at 101).  In one case, the Sacramento County Superior Court found that

8   retailers should consider "the price at which other sellers in the trade area offer comparable goods

9   of like grade or quality[,]" and the AG Committee stated that approach was "very similar to

10   'prevailing market price.'" (<u>Id.</u> at 104).  Again, however, the AG Committee Report does not define

11   the term; instead, it merely notes the difficulty in interpreting § 17501, (<u>see</u> <u>id.</u> at 10-22 , chapter

12   entitled "The Problem With Section 17501"), and looks at case law and statutes from other states

13   that relate to comparative price advertising.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 97-98 & 102-04).   The AG

14   Committee Report asks:

15          [W]hat is the "prevailing market price"?  Is it the price at which the greatest

16          number of sellers offer the product for sale, or is it the price at which the

17          greatest number of such items actually sells?  What if the item does not sell

18          for a uniform price?  Is an average selling price to be arrived at?  How?  Do

19          any sales of the item actually have to have been made to establish a

20          "prevailing market price" or is it sufficient if all merchants offer it for sale at a

21          given price, even though no merchant actually makes any sales of the item

22          at that given price?"

23   (<u>Id.</u> at 17).  These are just some of the questions presented by this provision, and although some

24   case law briefly touches on the topic, § 17501 "has yet to be construed by any court[.]"  <u>Brazil v.</u>

25   <u>Dell, Inc.</u>, 2010 WL 5258060, *4 (N.D. Cal. 2010).

26

27

28

As the sources described above do not directly answer the question presented by this case, the court also considers California's principles of statutory interpretation.[8] "A court's overriding purpose in construing a statute is to ascertain legislative intent and to give the statute a reasonable construction conforming to that intent. In interpreting a statute to determine legislative intent, a court looks first to the words of the statute." People ex rel. Gwinn v. Kothari, 83 Cal.App.4th 759, 767 (2000) (internal citation omitted). Further, the "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the legislature did not intend. Thus, the intent prevails over the letter, and the letter will, if possible, be read as to conform to the spirit of the act." Id. at 767-68 (internal quotation marks omitted).

Here, § 17501 qualifies "prevailing market price" by stating that it is "wholesale if the offer is at wholesale [and] retail if the offer is at retail[.]" Cal. Bus. & Prof. Code § 17501. The clause evinces a legislative intent that courts consider the specific offer at issue, such that the relevant "market" is tailored to fit the actual circumstances of the sale. Thus, prevailing market price should take into account not just the item itself (i.e., a blue cotton shirt of a certain type) but the offer as a whole (i.e., a blue cotton shirt of a certain type sold in a certain channel of distribution).

Overall, a few general principles can be distilled from the statute and the other sources described above to guide the court's analysis with respect to § 17501. First, according to the statute's clear language, when a retailer advertises a "former" or "original" price and compares it with a sale price, that "former" or "original" price must refer to the prevailing market price of the item. See Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price . . . unless the alleged former price was the prevailing market price[.]"). However, the "prevailing market price" is not limited to the price at which other retailers in the geographic area sold the item in the past. See, e.g., Mahfood, 2008 WL 5381088 (linking "prevailing market price" with "Retail

---

[8] The court applies California's rules of statutory construction in analyzing a California statute. See In re First T.D. & Inv. Inc., 253 F.3d 520, 527 (9th Cir. 2001); Federal Sav. and Loan Ins. Corp. v. Butler, 904 F.2d 505, 510 (9th Cir. 1990) ("When addressing an issue that has not been met by the California Supreme Court, we must apply the rule we believe that court would adopt were it confronted with the same situation. . . . [W]e apply settled principles of statutory construction under California law in order to resolve the question presented.") (internal quotation marks and citations omitted).

Value" as opposed to "QVC Value"); (AG Committee Report at 17) (considering "other sellers" and "all merchants").  In other words, advertised "former" or "original" prices must be the prevailing market price, but the prevailing market price is not simply the retailer's actual original price. Instead, the prevailing market price must take into account where, and at what price, the item in question is offered for sale.  See, e.g., Cal. Bus. & Prof. Code § 17501 ("retail if the offer is at retail" and "wholesale if the offer is at wholesale"); Faberge, 1971 WL 16493, at *2 (finding that Bravado has "never been sold for anything approaching $6.00");  AG Committee Report at 17) (providing as examples the number of "sellers [that] offer the product" and the price at which the "item[] actually sells").  At bottom, this is a simple and straightforward inquiry that assesses what is the item's proper market and where and how is the item marketed.  A court might ask, for example, what brand makes the item?  Where in the local area is the item sold?  And at what price?  In many circumstances, local sales prices for a particular item, in all stores offering it for sale, is an appropriate basis for the calculation of prevailing market price.  Under those circumstances, it makes little sense to engage in the more complex analysis of what items are similar to the one at issue and at what prices such similar items are sold.[9]

Here, JCPenney's "private and exclusive branded items of apparel [and] accessories," (see 4AC at ¶ 48), which include East Fifth, Worthington, and Liz Claiborne, (see id. at ¶¶ 26-34), are only sold at JCPenney stores.[10]  (See Joint App'x, Exh. 1.A, J.C. Penney Company, Inc. Form 10-

---

[9]  The court does not read the AG Opinion as compelling a different conclusion.  When the AG Opinion provides the example of a furniture dealer that takes into account the price of "similar mattresses . . . in the open local market," 57 Op. Att'y Gen. at 129, the reference to "similar mattresses" may refer to mattresses of the same brand, size, and type.  If, for example, the price of a queen Sealy® pillow top mattress were at issue, it might make sense to look to the local stores that sell such mattresses to determine the prevailing market price.  If, however, the item at issue was a Sleep Number® mattress, which are only sold at Sleep Number® stores, considering the price of "similar mattresses . . . in the open local market" will simply require examining the prices offered at local Sleep Number® stores.

[10]  Defendant states that the Liz Claiborne items purchased by plaintiff "are not part of this lawsuit because the proposed class is limited to JCPenney's private and exclusive brands and Liz Claiborne was neither." (Joint Brief at 12).  However, the record contains evidence suggesting that Liz Claiborne and Claiborne are exclusive brands.  (See Joint App'x Exh. 1.D, Copies of Various J.C. Penney Clothing Website Pages ("Website Pages") at 46 (advertisement indicating that "Liz Claiborne" is available "only at jcpenney"); id. at 47 (advertising "Claiborne" as available "only at

K for year ended Jan. 28, 2012 at 10-11; Website Pages at 45-51).  Therefore, the market for these items consists of defendant's stores.  During the Class Period, defendant's 81 California stores, (see id.), sold thousands of the individual items that plaintiff purchased.  (See Bergmark Decl. at ¶ 15).  The large volume of sales data for these items provides an appropriate basis upon which to determine their prevailing market prices.

This is especially true here, given defendant's own assertions regarding its price tags. Defendant asserts, (see Joint Brief at 46-47), that under the California Code of Regulations, the terms "regular" and "original" are references to "former price," as it is used in § 17501.  See 4 CCR § 1301.  Under § 17501, a "former price" is properly advertised only when it is the prevailing market price and it has been offered at that price for the preceding 90 days.  Therefore, defendant claims that when it used the words "regular" and "original," not only did it refer to its own previous prices, but it also "expressly invoked this statutory scheme."  (Joint Brief at 46).  According to defendant, then, a $30 "regular" or "original" price listed on a price tag means both that defendant's actual former price was $30, and that the prevailing market price was $30.  If that is so, then either of the following must be true: (1) defendant already took other retailers' prices for similar items into account when it determined its own original price[11] and a back-end comparison is unnecessary; or (2) defendant recognizes that the market for these items consists only of its own stores.  Either way, this strengthens plaintiff's argument in favor of applying defendant's own prices as the measure of prevailing market price in this case.

Using defendant's prices to determine the prevailing market price, it is clear that common questions underlying plaintiff's FAL claim predominate.  Mr. Bergmark has already analyzed

---

jcp")).

[11]  The evidence on this point is unclear.  For example, JCPenney Senior Vice President, General Merchandise Manager of Footwear and Handbags, Lorraine Hitch, testified that defendant's buyers use "Competitor Price Mapping" to determine the appropriate prices for its own products.  (See Joint App'x, Exh. 2 (Declaration of Lorraine Hitch in Support of JCPenney's Opposition to Motion for Class Certification) at ¶ 5).  However, JCPenney Senior Buyer, Caroline Majzun-Bearden, states that she does not believe anybody on her team ever used such documents to price merchandise, and that it may have been created by her predecessor.  (See Supplemental Declaration of Moe Keshavarzi in Support of J.C. Penney Corporation, Inc.'s Third Opposition to Motion for Class Certification, Exh. Supp-3, at 37).

1   defendant's sales data and found that defendant's advertised "original" price was not the prevailing

2   market price for the 90-day period preceding plaintiff's purchases.  (See Bergmark Decl. at ¶¶ 8-

3   16).  He has also analyzed defendant's internet sales data, and determined that "none of the

4   subject items ever sold at their Regular price on the internet."  (See id. at ¶ 16(d)).  Importantly,

5   he also explained that the analysis he performed for the items purchased by plaintiff "could easily

6   be performed for each and every item in the class description . . . if similar sales data regarding

7   those products is provided."  (See id. at ¶ 16(e)).

8       In Dukes, the Supreme Court said that 23(a)(2)'s requirement of commonality was not

9   satisfied because plaintiffs' expert could not "determine with any specificity how regularly

10  stereotypes play a meaningful role in employment decisions at Wal-Mart."  131 S.Ct. at 2553.

11  Because this was the "essential question" upon which plaintiffs' theory of commonality depended,

12  plaintiffs did not meet the standard.  See id. at 2553-54.  Here, however, Mr. Bergmark can

13  determine, with precise specificity, using an objective standard, how regularly the original or former

14  prices did not coincide with the prevailing market price for a given item.  This is the "essential

15  question" upon which plaintiff's FAL theory depends.  The question is common among the class

16  members, and its answer is key to the resolution of plaintiff's § 17501 claim.

17      Defendant argues that regardless of the definition of "prevailing market price," the language

18  of the FAL on its face requires plaintiff to "prove, for each advertised item, that JCPenney

19  published an advertisement setting forth" an improper price comparison.  (See Joint Brief at 44).

20  It calls this analysis "[i]nherently individualized" and states that "it generates not a single liability

21  question that is common across all class members."  (See id. at 45).  This argument ignores the

22  nature of plaintiff's claims as well as the evidence with which plaintiff intends to prove the class

23  claims.  This class action is not about the "inherently individualized" nature of each advertisement,

24  nor is it about different consumer products.  Rather, this case is about plaintiff and the class

25  members and their circumstances – given the nature of plaintiff's claims and the nature of

26  defendant's price comparison scheme, the impact that each subject item will have on all class

27  members will be the same.  See Dei Rossi v. Whirlpool Corp., 2015 WL 1932484, *7 (E.D. Cal.

28  2015) ("For purposes of class certification, it is sufficient that the alleged material

1  misrepresentation was part of a common advertising scheme to which the entire class was

2  exposed.") (internal quotation marks omitted).

3      As noted above, plaintiff intends to use defendant's Pricing Guidelines, policies, PPFCs,

4  and actual sales data for private and exclusive branded items.  See supra at § II.B.1.  This

5  common evidence, as opposed to advertisement-by-advertisement analysis, may establish liability.

6  See, e.g., Brazil, 2010 WL 5387831, at *5 ("Whether these representations were false is

7  susceptible to common proof in the form of Dell's pricing histories, as well as through testimony

8  from Dell's employees about the pricing policies."); see also Mayo v. Sears, Roebuck & Co., 148

9  F.R.D. 576 at 583 (S.D. Ohio 1993) (finding predominance when plaintiffs' "allegations turn on

10  [defendant's] use of identical forms, common sales techniques, and routinized procedures").

11  Moreover, defendant has not explained what an analysis of individual advertisements could

12  possibly show that the common evidence does not.  (See, generally, Joint Brief; see also Dei

13  Rossi, 2015 WL 1932484 at *7 (an item-by-item analysis was not required because defendant

14  "fail[ed] to identify any differences between the [allegedly unlawfully-advertised items] and those

15  purchased by Plaintiffs and the proposed class members.").  In short, the court finds that even if

16  some individualized analysis of advertisements is ultimately required, the common questions and

17  the voluminous common evidence will predominate with respect to plaintiff's FAL claim.

18          d.    *The FAL as a "Safe Harbor" Statute.*

19      Even if the common FAL questions under § 17501 did not predominate, the predominance

20  analysis with respect to the general FAL provision (§ 17500), the UCL, and CLRA would not

21  change.  JCPenney argues the opposite, asserting that § 17501 "carves out a statutory 'safe

22  harbor' in California for sellers advertising 'regular' and 'original' prices."  (Joint Brief at 48).

23  According to defendant, "[e]ven if [plaintiff] plans to proceed under the[ UCL, CLRA, and § 17500

24  of the FAL] using purported common proof, she cannot deprive JCPenney of its right to show that

25  the prices it advertised as 'regular' or 'original' complied with the [sic] Section 17501 (under a

26  proper interpretation of that statute)."  (Id.).

27      Contrary to defendant's assertion, however, § 17501 is not a "safe harbor" statute.  See

28  Brazil, 2010 WL 5258060, at *4 ("While the statute . . . may condone showing discounts from a

1  reference price as long as the reference price is the prevailing market price, the court finds that

2  the statute does not legitimize or provide a 'safe harbor' for clearly deceptive reference price

3  advertising.  Such an interpretation of the statute would vitiate the intent of this type of consumer

4  protection law.").  In other words, even if it were determined that defendant's advertising did not

5  violate § 17501, it could still be liable under the CLRA, the UCL and the more general provision

6  of the FAL.  Similarly, even if § 17501 claims needed to be litigated individually – which they do

7  not, see supra at § II.B.1.c. – common questions would still predominate under the other

8  provisions at issue.

9        It is important to note that JCPenney's arguments regarding commonality under Rule

10  23(a)(2) and predominance under 23(b)(3) focus only on individualized questions under § 17501

11  of the FAL.  (See Joint Brief at 44-49).  JCPenney relies entirely on its safe harbor argument to

12  defeat predominance and commonality with respect to the other statutes at issue.  (See id. at 48-

13  49).  That argument fails, however, and JCPenney has not even attempted to suggest that

14  commonality and predominance are not met with respect to plaintiff's other claims.  (See,

15  generally, id.).  To the extent JCPenney bases its challenge to commonality and predominance

16  on its safe harbor argument, it appears to have abandoned any argument challenging commonality

17  and predominance under the UCL, CLRA, and § 17500 of the FAL.  Essentially, defendant does

18  not appear to challenge that the basic common question – whether defendant's price comparison

19  scheme generated false advertisements that deceived consumers – predominates under the UCL,

20  CLRA, and § 17500 of the FAL.

21                              e.    *Remedies.*

22        Defendant asserts that common issues regarding plaintiff's requested remedies do not

23  predominate.[12]  (See Joint Brief at 29-33).  As an initial matter, to the extent defendant contends

24  _____

25      [12]   The parties' briefing on the predominance of common issues of law or fact related to
    remedies focuses solely on plaintiff's request for restitution.  (See Joint Brief at 27-42).  The Joint
26  Brief does not address predominance as to the requested injunction (see 4AC at 26-7, Prayer for
    Relief), or restoration under the CLRA restoration (see id.).  (See, generally, Joint Brief).  To the
27  extent there are any questions related to predominance for these or any other remedies, courts
    "uniformly h[o]ld that the 23(b)(3) predominance requirement is satisfied despite the need to make
28  individualized damage determinations."  2 Newberg on Class Actions § 4:54, at 206 (5th Ed.

that plaintiff has failed to propose a valid restitution measure (see id. at 29), the court has already addressed this argument and found that plaintiff is entitled to propose these methods as long as they are measurable and supported by evidence.  (See Court's Order of March 23, 2015, at 6-9).

Nonetheless, in order to satisfy the predominance requirement, plaintiff must present a damages model that is consistent with her liability case, and the court "must conduct a rigorous analysis to determine whether that is so."  Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433 (2013) (internal quotation marks omitted); see Leyva v. Medline Industries, Inc., 716 F.3d 510, 514 (9th Cir. 2013) ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").  Although plaintiff must present the likely method for determining class damages, "it is not necessary to show that [this] method will work with certainty at this time."  Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010).  Further, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."  Leyva, 716 F.3d at 514.  The same principles apply to awards of restitution.  See Chavez, 268 F.R.D. at 379 (discussing "damages" for all causes of action generally, which included Cal. Bus. & Prof. Code §§ 17200 and 17500); Zeisel v. Diamond Foods, Inc., 2011 WL 2221113, *11 (N.D. Cal. 2011) (applying Chavez to claims for restitution).

Plaintiff has proposed three alternative restitution measures in this case: "1) complete restitution, measured by the full purchase price paid by each class member; 2) restitution based on the false 'transaction value' promised by JCPenney, measured by the amount that each class member would have paid had JCPenney offered a discount from the actual 'regular' price; or 3) restitution in the amount that JCPenney profited from sales of products based on deceptive price comparisons."  (Joint Brief at 27).  Plaintiff asserts that each theory "rests on simple, mathematical calculations using JCPenney's objective sales data and class member receipts."  (See id.).

Defendant asserts that plaintiff's proposals fail to meet the standard set forth in Comcast because her damages case is not consistent with her liability case.  (See Joint Brief at 33).  It argues that "[w]here . . . the plaintiff alleges that she received something of worth . . . the proper

2012); see also Blackie, 524 F.2d at 905 (Even when the amount of damages is an individual question it "does not defeat class action treatment.").

1    measure of restitution is the return of the excess of what the plaintiff gave the defendant over the

2    value of what the plaintiff received." (See id.) (internal quotation marks omitted).  Accordingly,

3    defendant claims, since plaintiff's proposed restitution models do not attempt to do that, she

4    "cannot possibly establish that damages are susceptible of measurement across the entire class

5    for purposes of Rule 23(b)(3)."  The court previously rejected this argument when it ruled on

6    defendant's motion for summary judgment.  (See Court's Order of March 23, 2015, at 7) ("In any

7    event, although California case law makes clear that repayment of the difference between what

8    the plaintiff paid and the value of what the plaintiff received can be a measure of restitution,

9    defendant has not cited, nor has the court found, any authority indicating that is the only way

10   restitution can be calculated.") (internal citation omitted).

11         Moreover, the court has found that plaintiff's proposed methods are consistent with her

12   liability case.  With respect to the "complete restitution" and "net profits" methods, "plaintiff has

13   presented evidence that every dollar she spent was a result of JCPenney's alleged false

14   advertising." (Court's Order of March 23, 2015, at 10).  With respect to "false transaction value,"

15   plaintiff has presented evidence that "the amount [she] thought she was saving was a factor in her

16   purchase decisions." (See id. at 12).  Therefore, the evidence that plaintiff has introduced shows

17   that her restitution theories are closely tied to defendant's alleged actions and are unquestionably

18   linked to her liability theories.  For these reasons, plaintiff has satisfied her burden under Comcast

19   to show that her proposed damages methodologies "stemmed from the defendant's actions that

20   created the legal liability." See Leyva, 716 F.3d at 514.

21         Defendant also raises the argument that one of plaintiff's proposed restitution methods,

22   "complete restitution," "has been found not to be an appropriate class action remedy." (See Joint

23   Brief at 37).  Defendant cites a number of federal Truth in Lending Act, 15 U.S.C. §§ 1601 et seq.,

24   ("TILA") cases.  (See id. at 37-38).  These cases, however, focus specifically on the restitution

25   prescribed by TILA (i.e., returning a loan principle, releasing liens, and repaying any interest

26   and/or other payments) and do not apply to consumer protection statutes that do not raise the

27   same concerns. See, e.g., Andrews v. Chevy Chase Bank, 545 F.3d 570, 574-75 (7th Cir. 2008),

28   cert. denied, 557 U.S. 936 (2009) (describing TILA as "entirely different" from other statutes for

1   which class actions may be appropriate and noting that "the rescission remedy prescribed by TILA

2   is . . . incompatible with the class-action device") (emphasis added).  Further, defendant's reliance

3   on Schramm v. JPMorgan Chase Bank, N.A., 2011 WL 5034663 (C.D. Cal. 2011), is

4   unpersuasive.    In Schramm, the court also faced a putative class seeking to undo loan

5   transactions, and it found that rescission would necessitate "inquiries into each individual

6   borrower's situation because it generally includes the return of all interest, fees, finance charges,

7   and commissions paid in connection with the loan[,]" as well as "judicial consideration of the

8   individual circumstances of the particular transaction."  See id. at *12 (internal quotation marks

9   omitted).

10          The issues related to rescission in the lending context simply do not apply to this case.

11  Plaintiff's "complete restitution" proposal contemplates that defendant "offer her (and each class

12  member) the opportunity to rescind his or her transaction(s), return the products purchased, and

13  obtain a full refund. . . .  Under this method, there is no need to measure the value of the benefit

14  received by Plaintiff because she would be required to return the products she purchased."  (See

15  Joint Briefing re JCPenney's Renewed Motion for Summary Judgment at 23-24).  The amount of

16  money that each putative class member paid for items can be determined by reference to receipts,

17  or it can be "readily calculated using Defendant's sales numbers[.]" See Ortega v. Natural Balance,

18  Inc., 300 F.R.D. 422, 430 (C.D. Cal. 2014).  As described previously, plaintiff has introduced

19  common evidence that would enable the court to accurately calculate damages for each claim.

20  This is so regardless of the fact that such calculations may need to be made with respect to each

21  relevant item.  See, e.g., Leyva, 716 F.3d at 514 (noting that using computer records made it

22  possible to "multiply each employee's hourly rate by the number of workweeks he/she was

23  employed[,]" and therefore that "damages could feasibly and efficiently be calculated once the

24  common liability questions are adjudicated") (internal quotation marks omitted); Blackie, 524 F.2d

25  at 905 ("should the class prevail the amount of price inflation during the period can be charted and

26  the process of computing individual damages will be virtually a mechanical task.").

27          Even if it is determined at trial that the value received by class members should be

28  deducted from the item's purchase price, such a "reduction in allowable damages . . . is not fatal

1    to class certification." McCrary v. Elations Co., LLC, 2014 WL 1779243, *15 (C.D. Cal. 2014).  As

2    described previously, "the amount of damages, even if it is an individual question, does not defeat

3    class certification."  Id. (internal quotation marks omitted); see also Yokoyama v. Midland Nat. Life

4    Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010) ("In this circuit, however, damage calculations alone

5    cannot defeat certification.  We have said that the amount of damages is invariably an individual

6    question and does not defeat class action treatment.") (internal quotation marks omitted).   For

7    these reasons, the court finds that common issues regarding plaintiff's proposed remedies

8    predominate.

9                    **2.    Superiority.**

10        "[T]he purpose of the superiority requirement is to assure that the class action is the most

11   efficient and effective means of resolving the controversy.  Where recovery on an individual basis

12   would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class

13   certification." Wolin, 617 F.3d at 1175-76 (citation and internal quotation marks omitted).  In cases

14   in which plaintiffs seek to recover relatively small sums and the disparity between litigation costs

15   and the recovery sought may render plaintiffs unable to proceed individually, "[c]lass actions may

16   permit the plaintiffs to pool claims which would be uneconomical to bring individually." Local Joint

17   Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163

18   (9t Cir.), cert. denied, 534 U.S. 973 (2001) (further finding that "[i]f plaintiffs cannot proceed as a

19   class, some – perhaps most – will be unable to proceed as individuals because of the disparity

20   between their litigation costs and what they hope to recover") (internal quotation marks and

21   alteration omitted).

22        As an initial matter, defendant has not identified or proposed a superior adjudication

23   method.  (See, generally, Joint Brief; Defendant J.C. Penney Corporation, Inc.'s Supplemental

24   Memorandum in Opposition to Plaintiff's Third Motion for Class Certification).   Nor could it,

25   because each class member's claim for restitution involves a relatively small sum of money, (see,

26   e.g., Receipt), and litigation costs would render individual prosecution of such claims prohibitive.

27    See Amchem Prods., Inc., 521 U.S. at 617, 117 S.Ct. at 2246 (finding that in drafting Rule

28   23(b)(3), "the Advisory Committee had dominantly in mind vindication of the rights of groups of

                                             34

1   people who individually would be without effective strength to bring their opponents into court at

2   all") (internal quotation marks omitted); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th

3   Cir.  2004), cert. denied, 543 U.S. 1051 (2005) (noting that "[t]he realistic alternative to a class

4   action is not 17 million individual suits, but zero individual suits" because of litigation costs)

5   (emphasis in original).  If the court did not certify the class, each plaintiff would have to litigate

6   defendant's liability separately even though it could be established by common evidence (e.g.,

7   policies, guidelines, PPFCs, and sales data) using objective standards (the reasonable consumer

8   and prevailing market price).  Courts considering similar cases routinely find that the class action

9   device is superior to other forms of adjudication.  See, e.g., Ortega, 300 F.R.D. at 430; Chavez,

10  268 F.R.D. at 379 ("[T]he court determines that the class action is superior to maintaining

11  individual claims for a small amount of damages[.]").

12      Finally, any class member who wishes to control his or her own litigation may opt out of the

13  class.  See Fed. R. Civ. P. 23(c)(2)(B)(v).  In short, the court finds that "a class action is superior

14  to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

15  23(b)(3).

16      C.    Liability-Only Class.[13]

17      Plaintiff argues that "[g]iven that an injunction is the 'primary' form of relief under the UCL

18  and FAL . . . the Court can, in the alternative, bifurcate issues under Rule 23(c)(4) and certify a

19  liability-only class, which would avoid altogether any issues concerning damages or restitution."

20  (See Joint Brief at 42).  JCPenney characterizes plaintiff's request for certification of a liability-only

21  class as futile, stating that "Ms. Spann has no standing to pursue injunctive relief and cannot

22  establish a claim for restitution, so bifurcation of the liability issue would advance the litigation

23  precisely to nowhere: even if Ms. Spann prevailed on liability, she would have no further recourse."

24

25  _____

26      [13]  In the event defendant seeks to appeal this court's decision, see Fed. R. Civ. P. 23(f), and
    in light of the parties' briefing the issue of whether a liability only class should be certified (see

27  Joint Brief at 42-44), the court believes it would serve judicial economy to address, in the
    alternative, the parties' arguments with respect to certification of a liability only class. Cf. Wolin,

28  617 F.3d at 1174 ("For example, appellants have set forth a proposed plan for a trial bifurcated
    with a liability phase and a damages phase, which the district court has not addressed.").

1   (Id. at 43-44).  However, the court has recently determined that plaintiff has standing to seek

2   injunctive relief, and that she may present her restitution theories.  (See Court's Order of March

3   23, 2015, at 7-20).

4        A class may be divided into subclasses, see Fed. R. Civ. P. 23(c)(4)-(5), or "a class may

5   be certified for liability purposes only, leaving individual damages calculations to subsequent

6   proceedings."  Comcast, 133 S.Ct. at 1437.  Even if JCPenney is correct and the putative class

7   is ultimately unable to recover restitution or obtain injunctive relief, the court could still certify a

8   liability-only class at this stage.  Contrary to defendant's arguments, the Ninth Circuit has held that

9   victims of alleged false price comparison schemes have been injured even if there is "no difference

10  in value between the product as labeled and the product as it actually is[.]"  Hinojos v. Kohl's

11  Corp., 718 F.3d 1098, 1105 (9th Cir. 2013) (internal quotation marks omitted).  Indeed, "the

12  deceived bargain hunter suffers a more obvious economic injury as a result of false advertising

13  . . . because the bargain hunter's expectations about the product he just purchased is precisely

14  that it has a higher perceived value and therefore has a higher resale value."  Id. at 1106

15  (emphasis in original).  In other words, there has been injury, and liability can still attach, even if

16  the relief sought – injunctive or restitutionary – is not ultimately obtained.  See, e.g., Colgan v.

17  Leatherman Tool Group, Inc., 135 Cal.App.4th 663, 704 (2006) (affirming the adjudication of

18  liability under the UCL and CLRA, reversing the award of damages and a mandatory injunction).

19       Defendant's argument that Comcast may have altered the availability of bifurcation (see

20  Joint Brief at 44, n. 33) is unavailing.  Comcast found that testimony proffered to show that

21  damages could be demonstrated at trial by a test common to all class members could not actually

22  do so because the damages calculation method was not tied to the liability case.  See Comcast,

23  133 S.Ct at 1433-35.  The Court did not hold that damages must be shown through classwide

24  evidence for common liability issues to predominate.  See, generally, Comcast.  "The case,

25  therefore, has no effect on the applicability of bifurcation: a case may be bifurcated with common

26  issues of liability tried before damages and damages tried using common evidence, if applicable,

27

28

1  or individualized evidence, as bifurcating courts often do."  4 Newberg on Class Actions, § 11:7,

2  at 24 (5th ed. 2014).[14]

3          A class action under Rule 23(c)(4) may be "limited to determining liability on a class-wide

4  basis, with separate hearings to determine – if liability is established – the damages of individual

5  class members, or homogeneous groups of class members[.]"  Butler v. Sears, Roebuck and Co.,

6  727 F.3d 796, 800 (7th Cir.  2013), cert. denied, 134 S.Ct. 1277 (2014); see 1966 Adv. Comm.

7  Notes to Rule 23(b)(3) ("Subdivision (b)(3) encompasses those cases in which a class action

8  would achieve economies of time, effort, and expense, and promote uniformity of decision as to

9  persons similarly situated, without sacrificing procedural fairness or bringing about undesirable

10 results. . . .   In this view, a fraud perpetrated on numerous persons by the use of similar

11 misrepresentations may be an appealing situation for a class action, and it may remain so despite

12 the need, if liability is found, for separate determination of the damages suffered by individuals

13 within the class."); 1966 Adv. Comm. Notes to Rule 23(c)(4) ("This provision recognizes that an

14 action may be maintained as a class action as to particular issues only.  For example, in a fraud

15 or similar case the action may retain its 'class' character only through the adjudication of liability

16 to the class; the members of the class may thereafter be required to come in individually and

17 prove the amounts of their respective claims.").  In light of the foregoing, it is clear that the court

18 can, in the alternative, bifurcate under Rule 23(c)(4) and a certify a liability-only class, eliminating

19 the need to address at this time any issues relating to restitution or damages.

20                                    **CONCLUSION**

21          Based on the foregoing, IT IS ORDERED THAT:

22

23 _____

24 [14]  Newberg states that the "few decisions finding that Comcast tends to defeat certification are focused on specific efforts at classwide damage testimony, not bifurcation per se."  4 Newberg on

25 Class Actions § 11:7, at 26.  Roach v. T.L. Cannon Corp., d/b/a Applebee's, 2013 WL 1316452 (N.D.N.Y. 2013), cited by defendant, is one such case.  It merely held that plaintiffs needed to

26 present a damages model "susceptible of measurement across the entire class," and that plaintiffs could not avoid that requirement by "arguing instead that this issue is separate from the question

27 of liability."  See id. at *3.  In any event, the Second Circuit recently vacated and remanded the decision,  finding that "Comcast does not mandate that certification pursuant to Rule 23(b)(3)

28 requires a finding that damages are capable of measurement on a classwide basis."  Roach v. T.L. Cannon Corp., 778 F.3d 401, 402 (2d Cir. 2015).

1.   Plaintiff's Motion for Class Certification **(Document No. 177)** is **granted**.  The court certifies the following class with respect to plaintiff's claims under the CLRA, FAL, and UCL:

All persons who, while in the State of California and between November 5, 2010 and January 31, 2012 purchased from JCPenney one or more private or exclusive branded items of apparel or accessories advertised at a discount of at least 30% off of the stated "original" or "regular" price, and who have not received a refund or credit for their purchases.

Excluded from the class are defendant, as well as its officers, employees, agents or affiliates, and any judge who presides over this action, as well as all past and present employees, officers and directors of JCPenney.  Also excluded is any person who only received a discount of 30% or more as a result of using one or more coupons.

2.  The court hereby appoints Cynthia E. Spann as the representative of the Class.

3.  The court hereby appoints the Stanley Law Group and Emge & Associates as class counsel.

Dated this 18th day of May, 2015.

_____
/s/
Fernando M. Olguin
United States District Judge