**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CYNTHIA E. SPANN, on behalf of herself and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>J.C. PENNEY CORPORATION, a Delaware Corporation, et al.,<br><br>Defendants. | Case No. CV 12-0215 FMO (RNBx)<br><br>**ORDER MODIFYING CLASS CERTIFICATION ORDER, PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND CLASS NOTICE, AND SETTING FINAL FAIRNESS HEARING** |

Having reviewed and considered all the briefing filed with respect to plaintiff's Unopposed Motion for Modification of Class Certification Order; Preliminary Approval of Settlement; and Establishment of Qualified Settlement Fund (Dkt. 246-1, "Motion") and the oral argument presented at the hearing on December 3, 2015 (see Dkt. 250, Minutes of December 3, 2015, hearing), the court concludes as follows.

**INTRODUCTION**

Plaintiff Cynthia Spann ("plaintiff") filed this action, individually and on behalf of others similarly situated, against J.C. Penney Corporation, Inc. ("JCPenney" or "defendant") on February 8, 2012. The Fourth Amended Complaint (Dkt. 160, "4AC"), the operative complaint in this matter, alleges five causes of action for (1) unfair, (2) fraudulent, and (3) unlawful business practices in violation of Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"); (4) false advertising in violation of

Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"); and (5) violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq. ("CLRA").  (See Dkt. 160, 4AC at ¶¶ 56-90). The court granted plaintiff's motion for class certification on May 18, 2015, appointing class counsel and plaintiff as representative of the class.  (See Dkt. 209, Court's Order of May 18, 2015 ("Certification Order") at 38).  Specifically, the certified class includes:

> [a]ll persons who, while in the State of California between November 5, 2010 and January 31, 2012 who purchased from JCPenney one or more private or exclusive branded items of apparel or accessories advertised at a discount of at least 30% off of the stated "original" or "regular" price, and who have not received a refund or credit for their purchases.
>
> Excluded from the class are defendant, as well as its officers, employees, agents or affiliates, and any judge who presides over this action, as well as all past and present employees, officers and directors of JCPenney.  Also excluded is any person who only received a discount of 30% or more as a result of using one or more coupons.

(Dkt. 209, Certification Order at 38).

The parties engaged in substantial settlement negotiations – beginning in the summer of 2013 – and reached a settlement in September, 2015.  (See Dkt. 246-1, Motion at 4-5).  In her motion, plaintiff seeks an order: (1) modifying the definition of the class previously certified; (2) preliminarily approving the proposed settlement between plaintiff and defendant; (3) directing notice of the proposed settlement to the class; (4) directing the establishment of a settlement fund; and (5) setting a schedule for final approval of the proposed settlement.  (See id. at 33).

## BACKGROUND

This case arises from plaintiff's March 5, 2011,  visit to a JCPenney store in Brea, California.  (See Dkt. 160, 4AC at ¶ 18).  During that visit, "in reliance on Defendants' false and deceptive advertising, marketing and pricing schemes, [plaintiff] purchased over $200.00 in private

1  branded and exclusive branded apparel and accessories[.]"[1]  (Id.).  Plaintiff alleges that while at

2  the store, she "observed that J.C. Penney advertised price comparisons on plastic placards above

3  or below each product offered for sale[, and that] [o]ne column showed what was represented to

4  be the 'original' price for each product[, and] [t]he next column showed the 'sale' price of each

5  item."  (Id. at ¶ 26).  Plaintiff "[b]eliev[ed] she was able to pay significantly less than what certain

6  products were worth and normally sell for in the retail marketplace, [and was thereby] induced to

7  purchase ten different items, all of which were offered at prices significantly lower than their stated

8  original prices."  (Id.).

9       Plaintiff asserts that, prior to February 1, 2012, "JCPenney engaged in a pervasive false

10  advertising scheme by which it advertised 'sale' prices that were substantially lower than

11  comparative 'regular' or 'original' prices for its private and exclusive branded apparel and

12  accessories."  (Dkt. 246-1, Motion at 2) (citations omitted).  She asserts that the "higher 'regular'

13  and 'original' prices (and implied savings) were false and deceptive because JCPenney hardly,

14  if ever, offered, sold or intended to sell its merchandise at those prices."  (Id.) (citations omitted).

15  She further alleges that JCPenney "temporarily stopped using false price comparisons on

16  February 1, 2012 when it initiated a 'fair and square' pricing campaign but, after a significant

17  decline in revenues, it returned to its original scheme, at least for some products, in early 2013."

18  (Id.) (citations omitted).

19       Since 2012, this litigation has been "vigorously pursued and hotly contested[.]"  (See Dkt.

20  246-1, Motion at 3).  In the summer of 2013, the parties engaged in "substantial negotiations"

21  regarding the structure of a class-wide settlement, which led to private mediation.  (See Dkt. 246-

22  2, Declaration of Matthew J. Zevin in Support of Unopposed Motion for Modification of Class

23  Certification Order; Preliminary Approval of Settlement and Notice Program; and Establishment

24  of Qualified Settlement Fund ("Zevin Decl.") at ¶ 9).  No settlement was reached at that time, but

25  the parties "periodically engaged in informal settlement negotiations" over the course of the

26  _____

27       [1]   Private brands are brands that JCPenney owns, designs, and develops, and exclusive
    brands are outside brands that are sold exclusively at JCPenney.  (See Dkt. 209, Certification
28  Order at 2) (citation omitted).

following two years.  (See id. at ¶¶ 9-10).  In July 2015, the parties attended another set of mediation sessions and reached a settlement in September.  (See id. at ¶¶ 11-13).

The settlement contemplates expanding the definition of the class and making benefits, in the form of cash or JCPenney store credit, available to class members.  (See Dkt. 246-1, Motion at 11-12; see also Dkt. 256-3, Zevin Decl., Exh. A ("Settlement Agreement") at ¶ 2.31).  The Settlement Agreement defines the class as follows:

> all persons who, while in the State of California and between November 5, 2010 and January 31, 2012, and between January 1, 2013 through December 31, 2014, purchased from JCPenney one or more private or exclusive branded items of apparel or accessories at a discount of at least 30% off the stated "original" or "regular" price, and who have not received a full refund or credit for their purchases.  Excluded from the Settlement Class are Defendant, as well as its officers, employees, agents or affiliates, and any judge who presides over this action, as well as all past and present employees, officers and directors of JCPenney.

(Dkt. 246-3, Settlement Agreement at ¶ 2.31).

The parties have agreed that JCPenney will establish a $50,000,000 settlement fund, which will include both a Cash Component and Class Allocation.  (See Dkt. 246-3, Settlement Agreement at ¶ 6.1).  The Cash Component will cover reasonable attorney's fees and costs, a reasonable class representative enhancement payment, and notice and administration costs.  (See id. at ¶¶ 6.1.1.1-3).  The portion of the settlement fund not used for the Cash Component will comprise the Class Allocation, which will be provided to class members in JCPenney store credit or cash.  (See id. at ¶ 6.1.2).  The amount of store credit or cash that each claimant receives will be determined using a system of points based on the value of each class member's qualifying transactions.  (See id. at ¶¶ 6.1.2.1 & 6.1.2.1.4).  For example, claimants with total purchase amounts[2] between $1-

---

[2]  Total purchase amounts will be determined in a number of ways. First, the transaction data for all known and identifiable class members will be supplied by JCPenney to the claims administrator, who will provide such class members with a unique identification number that they

4

100 will be assigned two points, $101-200 will be assigned three points, $201-300 will be assigned four points, and so forth, with a maximum of ten points for claimants with purchase amounts above $800. (See id. at ¶ 6.1.2.1.4). Once each claimant is assigned his or her points, those points will be divided by the total points of all claimants who submit timely and valid claim forms. (See id. at ¶ 6.1.2.1). The quotient shall be the percentage of the Class Allocation that each claimant will receive. (See id.). As stated above, claimants may elect to receive cash or JCPenney store credit, which will not expire and can be used with any other promotion, discount, or coupon. (See id. at ¶ 2.37).

The Settlement Agreement also contemplates non-monetary relief. Defendant agrees that going forward, "its advertising and pricing practices . . . will not violate Federal or California law, including California's specific price-comparison advertising statutes." (Dkt. 246-3, Settlement Agreement at ¶ 6.1.7). "Specifically, JCPenney agrees that any former price to which JCPenney refers in its price comparison advertising will be the actual, bona fide price at which the item was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith." (Id.). Additionally, JCPenney has agreed to "implement a compliance program, which will consist of periodic (no less than once a year) monitoring, training and auditing to ensure compliance with California's price comparison laws." (Id.).

## **LEGAL STANDARD**

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). Here, the court previously certified a class, but the parties' settlement is "conditioned upon

---

can enter on the settlement website to view the date and purchase amount of their transactions. (See Dkt. 246-3, Settlement Agreement at ¶ 6.1.2.1.2). Second, claimants who believe they made purchases that were not identified by JCPenney, or who believe that their data is incomplete or inaccurate, may submit receipts demonstrating qualified purchases, which may increase their allocation points. (See id. at ¶ 6.1.2.1.3). Finally, claimants who certify under penalty of perjury that they are members of the class, but do not have receipts, and for which there is no information in JCPenney's database, will receive one point. (See id. at ¶ 6.1.2.1.4).

1   the Court amending the Certification Order, for settlement purposes only[.]"  (See Dkt. 246-1,

2   Motion at 11).  While the court can amend or alter the class definition at any time before a decision

3   on the merits, see Fed. R. Civ. P. 23(c)(1)(C); see Vizcaino v. U.S. Dist. Court for Western Dist.

4   of Washington, 173 F.3d 713, 721 (9th Cir. 1999) (a court has explicit permission to alter or amend

5   a certification order before a decision on the merits), and can expand the scope of a settlement

6   class, see In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 325-26

7   (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999), the propriety of certification cannot be

8   assumed.  Thus, the court addresses below both the modification of the scope of the class and

9   the fairness of the settlement as a whole.

10  I.      MODIFICATION OF THE CLASS.

11          At the preliminary approval stage, the court "may make either a preliminary determination

12  that the proposed class action satisfies the criteria set out in Rule 23 or render a final decision as

13  to the appropriateness of class certification."  Smith v. Wm. Wrigley Jr. Co., 2010 WL 2401149,

14  *3 (S.D. Fla. 2010) (internal citation omitted); see also Sandoval v. Roadlink USA Pac. Inc., 2011

15  WL 5443777, *2 (C.D. Cal. 2011) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117

16  S.Ct. 2231, 2248 (1997)) ("Parties seeking class certification for settlement purposes must satisfy

17  the requirements of Federal Rule of Civil Procedure 23[.]").  "A court considering such a request

18  should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement

19  context.'"  Sandoval, 2011 WL 5443777, at *2 (quoting Amchem, 521 U.S. at 620, 117 S.Ct. at

20  2248).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack

21  the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings

22  as they unfold."  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248.

23          A party seeking class certification must first demonstrate that: "(1) the class is so numerous

24  that joinder of all members is impracticable; (2) there are questions of law or fact common to the

25  class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

26  of the class; and (4) the representative parties will fairly and adequately protect the interests of the

27  class."  Fed. R. Civ. P. 23(a).

28

1    "Second, the proposed class must satisfy at least one of the three requirements listed in

2    Rule 23(b)."  Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548 (2011).  At issue here is Rule

3    23(b)(3), which is satisfied if "the court finds that the questions of law or fact common to class

4    members predominate over any questions affecting only individual members, and that a class

5    action is superior to the other available methods for fairly and efficiently adjudicating the

6    controversy."  Fed. R. Civ. P. 23(b)(3).  However, courts need not consider the Rule 23(b)(3)

7    considerations regarding manageability of the class action, as settlement obviates the need for

8    a manageable trial.  See Morey v. Louis Vuitton N. Am. Inc., 2014 WL 109194, *12 (S.D. Cal.

9    2014) ("because this certification of the Class is in connection with the Settlement rather than

10   litigation, the Court need not address any issues of manageability that may be presented by

11   certification of the class proposed in the Settlement Agreement."); Rosenburg v. I.B.M., 2007 WL

12   128232, *3 (N.D. Cal. 2007) (discussing "the elimination of the need, on account of the

13   [s]ettlement, for the Court to consider any potential trial manageability issues that might otherwise

14   bear on the propriety of class certification.").

15   Below, the court evaluates the propriety of class certification for purposes of the settlement

16   while keeping in mind that it previously certified a slightly more limited class.  (See Dkt. 209,

17   Certification Order at 38).  As before, the proposed modified class must meet the requirements

18   of Rule 23.  See, e.g., Hahn v. Massage Envy Franchising LLC, 2015 WL 2164981, *1 (S.D. Cal.

19   2015) ("As before, certification is requested pursuant to Rules 23(a) and (b)(3) . . . [and] [a]lthough

20   the fact of settlement is relevant to the class certification analysis, certification must nonetheless

21   meet Rule 23(a) and (b)(3) requirements[.]"); Mehling v. New York Life Ins. Co., 246 F.R.D. 467,

22   474 (E.D. Pa. 2007) ("Because the settlement class has changed since the Court's original class

23   certification, and given the considerable time that has elapsed since that certification, the Court

24   will engage in the required Rule 23 analysis before certifying the settlement class.").

25

26

27

28

II.      FAIRNESS OF CLASS ACTION SETTLEMENT.

Rule 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." Officers for Justice v. Civil Service Comm'n of the City & Cnty. of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S. 1217 (1983).  Accordingly, a district court must determine whether a proposed class action settlement is "fundamentally fair, adequate, and reasonable." Staton, 327 F.3d at 959 (internal quotation marks omitted); see Fed. R. Civ. P. 23(e).  Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, Hoffer v. City of Seattle, 506 U.S. 953 (1992) (internal quotation marks and citation omitted).

Approval of a class action settlement requires a two-step process – a preliminary approval followed by a later final approval.  See Tijero v. Aaron Bros., Inc., 2013 WL 60464, *6 (N.D. Cal. 2013) ("The decision of whether to approve a proposed class action settlement entails a two-step process."); West v. Circle K Stores, Inc., 2006 WL 1652598, *2 (E.D. Cal. 2006) ("[A]pproval of a class action settlement takes place in two stages.").  At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval." Wright v. Linkus Enters., Inc., 259 F.R.D. 468, 472 (E.D. Cal. 2009).  Although "[c]loser scrutiny is reserved for the final approval hearing[,]" Harris v. Vector Mktg. Corp., 2011 WL 1627973, *7 (N.D. Cal. 2011), the showing at the preliminary approval stage – given the amount of time, money, and resources involved in, for example, sending out new class notices – should be good enough for final approval.  At this stage, the court may grant preliminary approval of a settlement and direct notice to the class if the settlement: "(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." Id. at *7; Alvarado v. Nederend, 2011 WL 90228, *5 (E.D. Cal. 2011) (same); Cordy v. USS-Posco Indus., 2013 WL 4028627, *3 (N.D. Cal. 2013)

8

("Preliminary approval of a settlement and notice to the proposed class is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.") (internal quotation marks omitted).  To undertake this analysis, the court "must consider plaintiffs' expected recovery balanced against the value of the settlement offer."  In re Nat'l Football League Players' Concussion Injury Litig., 961 F.Supp.2d 708, 714 (E.D. Pa. 2014) (internal quotation marks omitted).

## DISCUSSION

I.      CERTIFICATION OF THE MODIFIED CLASS.

On May 18, 2015, the court certified a class of California customers who purchased private or exclusive branded items from JCPenney at a discount of at least 30% off between November 5, 2010, and January 31, 2012.  (See Dkt. 209, Certification Order at 38).  The class definition excluded individuals who received the discount as a result of using one or more coupons.  (See id.).  In her current Motion, plaintiff seeks to amend the definition in two ways: first, to add individuals who purchased items between January 1, 2013 and December 31, 2014, and second, to eliminate the coupon exclusion.  (See Dkt. 246-1, Motion at 12).

With respect to the additional 2013-2014 period, plaintiff alleges that JCPenney only temporarily stopped using false price comparisons in February 2012 and returned to the scheme in early 2013.  (See Dkt. 160, 4AC at ¶¶ 6-7).  The court previously found it undisputed that "defendant is still formulating its official rules for its current comparative pricing strategy, but that in 2013 it began the process of returning the majority of its business to a promotional model." (Dkt. 204, Court's Order of March 23, 2015 ("MSJ Order") at 18) (internal quotation and alteration marks omitted).  Defendant acknowledges that "some of JCPenney's business returned to use of price comparison advertising" at that time.  (See Dkt. 173-2, Statement of Uncontroverted Facts at 40).  A JCPenney Senior Buyer testified that she was not aware of any differences between the pricing strategies used during the November 2010- January 2012 period and the period beginning in 2013.  (See id. at 43).

9

With respect to the second expansion – elimination of the coupon exclusion – the parties agree that "only a tiny fraction of [class] [m]embers would be subject to this exclusion, but Plaintiff has not discovered an automated or mechanical process to identify those persons with certainty." (See Dkt. 246-1, Motion at 15). Therefore, determining which individuals should be excluded on that basis would require a manual review of customer receipts, and the parties have determined that the "cost and burden" of such a process "would greatly outweigh the utility of maintaining the exclusion[.]" (See id. at 15-16). Additionally, plaintiff contends that the difference between discounts with coupons, as opposed to discounts through in-store "sales" or "markdowns" is a distinction without a difference. (See id.). This is because "JCPenney's products were hardly ever offered at the stated regular price[,]" "the use and dissemination of coupons at JCPenney was prolific[,]" and "the grossly inflated 'regular' and 'original' prices were used to support, and could only be temporarily sustained by, the false price comparison scheme" at the heart of this lawsuit. (Id. at 15).

For the reasons explained above, plaintiff contends the class definition should be broadened "because it is appropriate to include and award settlement proceeds to those additional consumers who were likely exposed to the same or similar practices as Plaintiff and the certified Class." (Dkt. 246-1, Motion at 12). She also asserts that it is appropriate "for JCPenney to buy and obtain peace with respect to all consumers who were likely exposed to such practices[.]"[3] (Id. at 13) (emphasis in original). The parties negotiated the Settlement Agreement with these principles in mind. (See id.; see also Dkt. 246-2, Zevin Decl. at ¶ 18).

A.   Rule 23(a) Requirements.

1.   **Numerosity.**

The court previously found that the class was sufficiently numerous under Rule 23(a)(1) (see Dkt. 209, Certification Order at 9-10), and an expansion of the class strengthens plaintiff's

---

[3] The court acknowledges that the parties agreed to expand the class for settlement purposes only. (See Dkt. 246-1, Motion at 13 n. 9). If the settlement is not approved, each party shall retain its rights as they existed prior to the execution of the Settlement Agreement, including maintenance of the original class certified by the court.

1    argument for satisfaction of this element.  The original class was comprised of 3,256,888 members

2    that could be identified through defendant's sales data, and including the 2013-2014 period will

3    add 2,395,410 new and unique class members who can be identified.  (See Dkt. 246-1, Motion

4    at 13; Dkt. 246-8, Declaration of Brian J. Bergmark in Support of Plaintiff's Motion for Modification

5    of Certification Order and Preliminary Approval of Class Action Settlement ("Bergmark Decl.") at

6    ¶ 9).  Thus, the expanded class will include 5,652,298 identifiable class members.  (See Dkt. 246-

7    8, Bergmark Decl. at ¶ 9).  JCPenney estimates that there are between 3,116,875 and 5,454,532

8    additional class members for whom the parties lack any contact or identifying information because

9    they paid with cash or with a credit card that is not associated with a customer profile.  (See Dkt.

10   246-7, Declaration of Adam Tarczynski ("Tarczynski Decl.") at ¶¶ 3 & 14).  Because it would be

11   impracticable to join this large group – between 8,769,173 and 11,106,830 customers in total (see

12   Dkt. 246-8, Bergmark Decl. at ¶ 10) – in individual litigation, the proposed expanded class easily

13   satisfies the numerosity requirement.  See Fed. R. Civ. P. 23(a)(1) (A class may be certified only

14   if it "is so numerous that joinder of all members is impracticable"); see also Harris v. Palm Springs

15   Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964) (impracticability means "difficulty or

16   inconvenience of joining all members of the class.") (internal quotation marks omitted).

17              2.    **Commonality.**

18        The court's prior discussion of commonality under Rule 23(a)(2) (see Dkt. 209, Certification

19   Order at 10-12) applies to the proposed expanded settlement class.   The commonality

20   requirement is satisfied if "there are common questions of law or fact common to the class," Fed.

21   R. Civ. P. 23(a)(2), which requires that plaintiff's claims "depend upon a common contention . . .

22   [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims

23   in one stroke."  Dukes, 131 S.Ct. at 2551.  All eight of the common questions the court set forth

24   as examples in the Certification Order apply just as well to the proposed expanded class.  (See

25   Dkt. 209, Certification Order at 11).  As was true then, "[t]hese common questions of law and fact

26   are susceptible to common proof – that is, testimony by plaintiff and her expert(s) explaining

27   whether the statements in the advertisements were false, as well as documents explicating

28   defendant's pricing policies and data – the 'truth or falsity' of which 'will resolve an issue that is

1   central to the claims' validity." (Id. at 11) (alteration marks omitted).  Expanding the class to

2   include customers who were exposed to similar advertising for an additional year and those who

3   obtained their 30% discounts using coupons as opposed to regular "sales" does not turn the

4   common questions into individual ones, nor does it change the method by which plaintiff's claims

5   would be proven.   Accordingly, the proposed expanded class satisfies the commonality

6   requirement of Rule 23(a)(2).

7           3.   **Typicality.**

8       Similarly, the court's prior discussion of typicality under Rule 23(a)(3) (see Dkt. 209,

9   Certification Order at 13) applies with equal force to the proposed expanded settlement class.

10   Typicality requires a showing that "the claims or defenses of the representative parties are typical

11   of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3).  The purpose of the requirement

12   "is to assure that the interest of the named representative aligns with the interests of the class."

13   Wolin v. Jaguar Land Rover North Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal

14   quotation marks omitted).   Defendant did not challenge this factor initially (see Dkt. 209,

15   Certification Order at 13), nor does the court see any reason that it should be challenged now.

16   Here, "plaintiff's claims are based on the same facts and the same legal and remedial theories as

17   the claims of the rest of the class members" (id.), and the proposed expansion of the class does

18   not change that.  Accordingly, the proposed expanded class meets the typicality requirement of

19   Rule 23(a)(3).

20           4.   **Adequacy of Representation**.

21       Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly

22   and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Defendant did not

23   challenge this factor at the outset, and the court found it satisfied. (See Dkt. 209, Certification

24   Order at 13).  With no reason to find otherwise, the court concludes that the adequacy of

25   representation element of Rule 23(a) remains satisfied.

26

27

28

B.      Rule 23(b)(3) Requirements.

Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotation marks omitted).  The rule requires two different inquiries, specifically a determination as to whether (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The court addresses the predominance and superiority requirements below.

1.      **Predominance**.

The Rule 23(b)(3) predominance inquiry focuses "on the relationship between the common and individual issues." In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (internal quotation marks omitted).  "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks omitted).

As described in the Certification Order, plaintiff's claims are under the UCL, FAL, and CLRA, and "the basic common question – whether defendant's price comparison scheme generated false advertisements that deceived consumers – predominates under [all three statutory schemes]." (See Dkt. 209, Certification Order at 30).  The court found that the essential questions at the heart of plaintiff's claims were common and would predominate over any other individualized issues, largely due to the fact that plaintiff would rely almost entirely on common evidence in the form of defendant's internal pricing guidelines, Price Pacing Flow Charts, and California sales data. (See id. at 15-16).  Plaintiff's request to add the additional time period to the class definition does not alter any of the court's prior analysis, as plaintiff specifically alleges that the allegedly false advertising stopped only temporarily between 2012 and 2013. (See Dkt. 160, 4AC at ¶¶ 6-7).  As a result, the claims, analysis, and evidence required would only expand to include additional transactions over the course of an additional year; their character and nature would

1  remain unchanged.[4]  As plaintiff notes, "the same evidence that would prove common claims on

2  behalf of the previously certified class would also be used to prove the claims of the expanded

3  Settlement Class."  (Dkt. 246-1, Motion at 15).

4       For similar reasons, removing the coupon exclusion alters the predominance analysis

5  slightly but does not change the nature of the claims such that the requirement is no longer met.[5]

6  As plaintiff points out, her case is premised on the idea that "JCPenney's products were hardly

7  ever offered at the stated regular price[.]"  (See Dkt. 246-1, Motion at 15).  If, using JCPenney's

8  sales and pricing data, plaintiff successfully proved that advertised original prices did not actually

9  refer to the "prevailing market prices" under the FAL, she could establish liability regardless of

10  whether the supposed discount was communicated in-store or on a coupon.  Under the UCL, a

11  claim based on false advertising or promotional practices requires that plaintiff only "show that

12  members of the public are likely to be deceived" by the defendant's conduct.  See In re Tobacco

13  II Cases, 46 Cal.4th 298, 312 (2009) (internal quotation marks omitted).  The CLRA mandates a

14  similar analysis, asking whether defendant's conduct was deceptive, and whether the deception

15  caused plaintiff to be harmed.  See Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1022 (9th Cir.

16  2011), cert. denied, 132 S.Ct. 1970 (2012), abrogated on other grounds by Comcast Corp. v.

17  Behrend, 133 S.Ct. 1426 (2013).

18       In this case, liability under the UCL and CLRA could be established if plaintiff showed that

19  defendant's advertisements of 30% discounts, whether printed in-store on price tags or signs

20  above clothing racks, or printed in newspapers, magazines or coupons, were material and likely

21  to deceive customers.  As the court stated previously, "[i]t may be shown from [defendant's pricing

22

23       [4] This is particularly so because plaintiff alleges – and one of defendant's employees confirmed
24  – that the pricing and advertising methods in use during the 2013-2014 period were the same as
    those in use during the initial class period.  (See Dkt. 160, 4AC at ¶¶ 6-7 & Dkt. 173-2, Statement
25  of Uncontroverted Facts at 43).

26       [5]  The court recognizes that the parties have agreed to the expansion of the class for
    settlement purposes only.  (See Dkt. 246-1, Motion at 15).  If the settlement is not approved, the
27  court will not presume that defendant agreed to this expansion of coupon users for all purposes.
    Each party shall retain its rights as they existed prior to the execution of the Settlement
28  Agreement, including maintenance of the original class certified by the court.

policies, guidelines, practices, and actual sales data] that defendant's advertising practices are deceptive, and that inquiry predominates over any individualized issues that arise in connection with the advertisements themselves.  See, e.g., Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976) ('[C]ourts have taken the common sense approach that the class is united by a common interest in determining whether defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions[.]')."  (Dkt. 209, Certification Order at 19).  In other words, that some class members may have used coupons does not alter the fact that plaintiff "intends to rely on empirical data demonstrating that false price comparisons deceive consumers and influence their purchasing decisions." (Id. at 20) (internal quotation marks omitted).  Accordingly, the proposed expanded class meets the predominance requirement of Rule 23(b)(3).

### 2.  **Superiority**.

Finally, the superiority requirement of Rule 23(b)(3) remains satisfied because the ultimate recovery by settlement class members would be dwarfed by the cost of litigating on an individual basis, and any settlement class member who wishes to opt out may do so.  (See Dkt. 209, Certification Order at 34-35).  "In short, the court finds that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" (See id. at 35) (citing Fed. R. Civ. P. 23(b)(3)).  As stated previously, in the context of settlement, the other requirements of Rule 23(b)(3) such as "the desirability or undesirability of concentrating the litigation of the claims in the particular forum" and "the likely difficulties in managing a class action[,]" see Fed. R. Civ. P. 23(b)(3)(C)-(D), "are rendered moot and are irrelevant."  Barbosa v. Cargill Meat Solutions Corp., 2013 WL 3340939, *11 (E.D. Cal. 2013); Amchem, 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.") (citation omitted). Under the circumstances, the court finds that the superiority requirement is satisfied.

II.     FAIRNESS OF THE SETTLEMENT.

        The court's preliminary evaluation of the Settlement Agreement "does not disclose grounds to doubt its fairness[,] . . . such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval[.]" In re Vitamins Antitrust Litig., 2001 WL 856292, *4 (D.D.C. 2001) (internal quotation marks omitted).

        A.      The Settlement is the Product of Arm's-Length Negotiations.

        "This circuit has long deferred to the private consensual decision of the parties." Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009).  The Ninth Circuit has "emphasized" that

        the court's intrusion upon what is otherwise a private consensual agreement
        negotiated between the parties to a lawsuit must be limited to the extent
        necessary to reach a reasoned judgment that the agreement is not the
        product of fraud or overreaching by, or collusion between, the negotiating
        parties, and that the settlement, taken as a whole, is fair, reasonable and
        adequate to all concerned.

Id. (internal quotation marks omitted).  The Ninth Circuit does not follow the approach of other circuits that requires district courts to "specifically weigh[] the merits of the class's case against the settlement amount and quantif[y] the expected value of fully litigating the matter." Id.  Rather, the Ninth Circuit examines whether the settlement is "the product of an arms-length, non-collusive, negotiated resolution[.]" Id.  When it is, courts afford the parties the presumption that the settlement is fair and reasonable.  See, e.g., In re Heritage Bond Litig., 2005 WL 1594403, *9 ("A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery.") (internal quotation marks omitted).

        Here, there is no evidence of collusion or fraud leading to, or taking part in, the settlement negotiations between the parties.  On the contrary, this matter was "hard fought and contentiously litigated throughout." (See Dkt. 246-1, Motion at 18).  For example, plaintiff's counsel describes the parties' discovery efforts as follows:

1            [M]y co-counsel and I engaged in extensive legal research and analysis and
2            conducted thorough and substantial class and merits discovery, including
3            depositions of four Rule 30(b)(1) witnesses, five Rule 30(b)(6) witnesses and
4            two expert witnesses designated by JCPenney.  These depositions took
5            place in Washington D.C., Plano, Texas, and Los Angeles and Palo Alto,
6            California.  We also served interrogatories, requests for admissions and six
7            sets of document requests, and we defended the depositions of Plaintiff and
8            her expert, Brian Bergmark.   We received, reviewed and analyzed
9            JCPenney's written discovery responses, as well as the documents that
10            JCPenney produced in the Litigation, including the extensive and voluminous
11            sales data for the tens of millions of transactions entered into by the certified
12            Class.

13 (Dkt. 246-2, Zevin Decl. at ¶ 5).

14       In addition to discovery practice, the parties engaged in substantial motion practice before
15 this court:

16            My co-counsel and I amended the complaint in order to keep up with
17            changes in JCPenney's pricing practices; opposed three motions to dismiss
18            and/or strike; opposed two motions for summary judgment; briefed three
19            motions for class certification; and successfully opposed JCPenney's petition
20            for interlocutory appellate review of the Court's order granting class
21            certification.  We also engaged in numerous discovery disputes, including
22            several motions to compel, and participated in countless hours of meet and
23            confer negotiations, many of them transcribed, concerning a multitude of
24            discovery issues and motion practice.

25 (Dkt. 246-2, Zevin Decl. at ¶ 6).  After the court certified the class, the parties continued to litigate
26 the matter.  They took additional depositions, sought and obtained additional discovery, and
27 continued to engage in motion practice and consult with their experts.  (See id. at ¶ 8).

28

Settlement discussions were ongoing throughout the litigation.  During the summer of 2013, the parties engaged in "substantial negotiations . . . concerning the possible structure of a class-wide settlement."  (Dkt. 246-2, Zevin Decl. at ¶ 9).  Those negotiations led to private mediation in the fall of 2013, which was unsuccessful despite a full day of mediation and follow-up discussions.  (See id.).  Over the next two years, the parties "periodically engaged in informal settlement negotiations," which also proved unsuccessful.  (See id. at ¶ 10).  Then, in July 2015, the parties attended another full day of mediation with a different mediator.  (See id. at ¶ 11).  The parties accepted the mediator's proposal after that session and returned for another two full days of mediation in August and September 2015.  (See id. at ¶¶ 12-13).  The mediation "concluded with the Parties agreeing to all material terms of the Settlement, which was documented in a short-form Memorandum of Settlement, executed by the Parties and counsel on September 10 and 11, 2015."  (Id. at ¶ 13).  Thereafter, the parties "negotiated, drafted, and executed the comprehensive Settlement Agreement that is currently before the Court[.]"  (Id.).

Based on the evidence and record before the court, the court is persuaded that the parties thoroughly investigated and considered their own and the opposing party's positions.  The parties clearly had a sound basis for measuring the terms of the Settlement Agreement against the risks of continued litigation, and there is no evidence that the agreement is "the product of fraud or overreaching by, or collusion between, the negotiating parties[.]"  Rodriguez, 563 F.3d at 965 (quoting Officers for Justice, 688 F.3d at 625).

    B.    The Amount Offered in Settlement Falls Within a Range of Possible Judicial Approval and is a Fair and Reasonable Outcome for Class Members.

        1.    **Recovery for Class Members**.

The settlement is fair, reasonable, and adequate, particularly when viewed in light of the risks of continued litigation in this case.  As the Ninth Circuit has noted, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  Officers for Justice, 688 F.2d at 624 (internal quotation marks omitted).  Here, the Class Allocation of the $50 million settlement amount will confer an adequate recovery for class members.  Simply dividing the $50 million settlement amount amongst the estimated 8 to 11 million settlement class

1   members derives an average benefit of about $5 to $6 per class member.  (See Dkt. 246-1,

2   Motion at 21).  In practice, however, only claimants will receive cash or store credit, and the

3   amount they receive will depend upon the fees and costs awarded by the court, the number of

4   claims submitted, and the amount that claimants spent on qualifying purchases, i.e., their resulting

5   point allocations.  Assuming that notice and administration costs equal the claims administrator's

6   estimate of $2,425,274, and assuming that the court awards the full amount requested for

7   attorney's fees ($13,500,000), costs ($250,000),[6] and an enhancement award to plaintiff

8   ($10,000), there would be $33,814,726 remaining in the Class Allocation for distribution among

9   claimants.  (See Dkt. 246-8, Bergmark Decl. at ¶ 19).

10          The recovery for each claimant, in the form of cash or store credit, will vary depending on

11  the percentage of class members that make claims.  For example, assuming a high-end estimate

12  of 11,106,830 class members (see Dkt. 246-8, Bergmark Decl. at ¶ 22) and a low-end estimate

13  of 8,769,173 (see id. at ¶ 21), a 2% claim rate would provide a minimum benefit of $101.48 -

14  $128.54; an average benefit of $152.22 - $192.81; and a maximum benefit of $507.40 - $642.70

15  per claimant.[7]  (See id. at ¶¶ 21 & 22).  A 5% claim rate would result in a minimum benefit of

16  $40.59 - $51.42; an average benefit of $60.89 - $77.12; and a maximum benefit of $202.96 -

17

18          [6] The Settlement Agreement authorizes up to $500,000 in costs for class counsel, but at the

19  time plaintiff's expert Brian Bergmark estimated claim rates and per-claimant allocations, he
    estimated that class counsel's costs were not more than $250,000.  (See Dkt. 246-1, Motion at

20  22).  Class counsel has since filed an Unopposed Motion for Attorneys' Fees, Litigation Costs and
    Class Representative's Enhancement Payment (Dkt. 248-1, ("Fees Motion")), which requests an

21  award of costs in the amount of $191,080.91.  (See Fees Motion at 1).  Assuming that the court

22  awards that amount, the per-claimant recovery described in this paragraph is slightly under-
    estimated.  Rather than a Class Allocation of $33,814,726, an estimated $33,873,645.09 would

23  remain to be allocated among class members.

24          [7] The minimum benefit refers to the minimum benefit available with proof of a qualifying

25  purchase, which would entitle a claimant to two points.  (See Dkt. 246-8, Bergmark Decl. at ¶ 22).
    Bergmark defines the average benefit as three points and the maximum benefit as ten points.

26  (See id.; see also Dkt. 246-3, Settlement Agreement, ¶ 6.1.2.1.4 (setting forth the formula for point
    allocations)).  Claimants who do not have a proof of purchase would receive one point, and with

27  a 2% claim rate, such individuals would receive $50.74.  (See Dkt. 246-8, Bergmark Decl. at ¶ 22).
    They would receive $20.30 with a 5% claim rate, $10.15 with a 10% claim rate, and $5.07 with a

28  20% claim rate.  (See id.).

$257.08.  (See id.).  A 10% claim rate would result in a minimum benefit of $20.30 - $25.71; an average benefit of $30.44 - 38.56; and a maximum benefit of $101.48 - $128.54, while a 20% claim rate would result in benefits ranging from $10.15 - $12.85 minimum; $15.22 - $19.28 average; and $50.74 - $64.27 maximum.[8]  (See id.).  In comparison, the average amount that known class members spent at JCPenney during the relevant time periods was $154.19, and the average amount paid per item was $11.36.  (See id. at ¶ 11).  The Cash Allocation is therefore expected to provide the average claimant with sufficient compensation to purchase at least two, if not several, items at JCPenney, and it could very well return a significant portion of the total amount that many claimants spent at JCPenney.

Additionally, the settlement promotes consumer protection in that JCPenney has agreed that its advertising and pricing practices as of the date of the settlement agreement and continuing forward "will not violate Federal or California law, including California's specific price-comparison advertising statutes."  (Dkt. 246-3, Settlement Agreement at ¶ 6.1.7).  "Specifically, JCPenney agrees that any former price to which JCPenney refers in its price comparison advertising will be the actual, bona fide price at which the item was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith."  (Id.).  Additionally, and "[a]s a further direct result of this Litigation," JCPenney will implement a compliance program that will include monitoring, training, and auditing to ensure compliance with California's price comparison laws.  (See id.).

---

[8]  The use of two, five, ten and 20 percent claim rates is reasonable in this case.  See, e.g., Couser v. Comenity Bank, 2015 WL 5117082, *7 (S.D. Cal. 2015) (noting that a claim rate of 7.7% was "large" and "higher than average").  Here, the parties have noted that the claim rate might be depressed due to the fact that they cannot provide direct notice to roughly half of the settlement class.  (See Dkt. 246-1, Motion at 23 n. 16); see also In re Toys R Us-Delaware, Inc. - (FACTA) Litig., 295 F.R.D. 438, 468 n. 134 (C.D. Cal. 2014) (citing authority that claim rates in consumer litigation generally range from two to 20 percent, but when direct notice is not possible for the entire class, the claim rate may be depressed).  In In re Online DVD-Rental Antitrust Litig., 779 F.3d 934 (9th Cir. 2015), for example, the Ninth Circuit recently approved a settlement in which the parties sent direct notice to 35 million class members and received 1,183,444 claims, which represents a 3.4% claim rate.  See id. at 941.

The settlement the parties have reached is even more compelling given the substantial litigation risks in this case.  Even if plaintiff were to prevail at trial, there is a very real risk that plaintiff could recover nothing.  See, e.g., Schaffer v. Litton Loan Servicing, LP, 2012 WL 10274679, *11 (C.D. Cal. 2012) ("Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).");  Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (internal quotation marks omitted).  There are risks with respect to each of plaintiff's proposed measures of restitution.  For example, with respect to her "complete restitution" measure, class members would obtain full refunds of their purchase prices only if they returned their products to JCPenney.  (See Dkt. 204, MSJ Order at 9).  It is unknown how many class members would actually return their items for a refund; those that chose not to return would receive nothing, and those who chose to return items would lose the benefits of the products they purchased.

Under plaintiff's proposed "transaction value" measure of restitution, claimants would receive the value promised but not delivered by JCPenney's price comparisons.  (See Dkt. 204, MSJ Order at 11).  Using this method, claimants would receive the difference between the amount that the claimant actually paid and the amount that the claimant would have paid if the discount from the regular price of the item in question was actually as advertised.  (See id.).  Although the Settlement Agreement was signed before plaintiff commissioned the "complete and costly analysis that would be required" to calculate recovery under this methodology (see Dkt. 246-1, Motion at 24), plaintiff's expert was able to estimate damages per class member using average discounts and average price paid per item during the class periods.  (See Dkt. 246-8, Bergmark Decl. at ¶ 15).  If this litigation were to continue, defendant would undoubtedly challenge such a methodology and the use of statistical analysis to calculate damages at all.

Finally, under plaintiff's "net profit" measure of restitution, the court would "calculate defendant's net profits (revenue minus cost) for each item sold through its deceptive price

comparison scheme and order defendant to restore such amount to [claimants]." (See Dkt. 204, MSJ Order at 13) (internal quotation and alteration marks omitted).  Although plaintiff's expert has not yet been given access to JCPenney's cost data for each item sold to class members (see Dkt. 246-8, Bergmark Decl. at ¶ 16), plaintiff anticipates that the parties "would undoubtedly disagree as to which costs are appropriately deducted" (see Dkt. 246-1, Motion at 25), and discovery and litigation on this issue alone would be time consuming and costly for the parties.

The parties also "litigated and negotiated under a huge cloud of uncertainty concerning JCPenney's financial stability."  (See Dkt. 246-1, Motion at 21).  Throughout this litigation, the parties have acknowledged JCPenney's financial losses following its move to a non-comparative pricing scheme in 2013.  (See, e.g., Dkt. 173-2, Statement of Uncontroverted Facts at 39-40).  According to plaintiff, "JCPenney's stock price is currently trading at a fraction of its value from 2011 and, for the fiscal year ended January 31, 2015, it suffered an adjusted net loss from operations of $816 million and had free cash flow of only $57 million." (Dkt. 246-1, Motion at 21; Dkt. 246-2, Zevin Decl. at ¶ 17).  These and other facts "weighed heavily on the settlement negotiations and strongly support [its] reasonableness[.]"  (Dkt. 246-1, Motion at 21); see Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993), cert. denied, 512 U.S. 1220 (1994) ("Here one factor predominates to make clear that the district court acted with its discretion [in approving the settlement].  That factor is [defendant's] financial condition.").

In sum, even if plaintiff successfully proved her case at trial, the amount of restitution recovered, if any, could vary widely depending on a number of factors, including the court's discretion as to whether and how much to award in restitution, discovery and analysis regarding the appropriate method by which to calculate such an award, and JCPenney's ability to satisfy a judgment awarding the maximum amounts sought by plaintiff.  Further, if any sum – whether large or small – were recovered, it may take years to complete the appeals that would likely follow entry of judgment.  Under this Settlement Agreement, on the other hand, the class has access to a guaranteed, fixed, immediate, and substantial recovery of $50 million, as well as meaningful and prospective remedial relief.

2.    **Release of Claims**.

Beyond the value of the settlement, potential recovery at trial, and inherent risks in continued litigation, courts also consider whether a class action settlement contains an overly broad release of liability.  See Newberg on Class Actions § 13:15, at p. 326 (5th ed. 2014) ("Beyond the value of the settlement, courts have rejected preliminary approval when the proposed settlement contains obvious substantive defects such as . . . overly broad releases of liability."); see also Fraser v. Asus Computer Int'l, 2012 WL 6680142, *3 (N.D. Cal. 2012) (denying preliminary approval of proposed settlement that provided defendant a "nationwide blanket release" in exchange for payment "only on a claims-made basis," without the establishment of a settlement fund or any other benefit to the class).

Here, plaintiff and the settlement class members who do not opt out of the Settlement Agreement release claims "of any and every kind that were asserted in the Litigation, or that could have been asserted but were not asserted in the Litigation . . . on the basis of, connected with, arising out of, or related in whole or in part to any or all of the alleged acts, omissions, facts, matters, transactions, circumstances, and occurrences that were directly or indirectly alleged" in the litigation.  (Dkt. 246-3, Settlement Agreement at ¶¶ 13.1.1 & 13.1.3).  Additionally, while the Settlement Agreement contains a waiver of rights under § 1542 of the California Civil Code, such waiver is specifically limited to such "rights or benefits that they . . . may now have as a result of the alleged facts, circumstances, and occurrences underlying the claims set forth in the Litigation[.]"  (See id. at ¶ 13.1.3.).  With this understanding of the release, i.e., that it does not apply to claims other than those related to the subject matter of the litigation, the court finds that the release adequately balances fairness to absent class members and recovery for plaintiffs with defendants' business interest in ending this litigation with finality.  See, e.g., Fraser, 2012 WL 6680142, at *4 (recognizing defendant's "legitimate business interest in 'buying peace' and moving on to its next challenge" as well as the need to prioritize "[f]airness to absent class member[s]").

1      C.    The Settlement Agreement Does Not Improperly Grant Preferential Treatment to the

2              Class Representative.

3      "Although [the Ninth Circuit] ha[s] approved incentive awards for class representatives in

4 some cases, [it has instructed] district courts to scrutinize carefully the awards so that they do not

5 undermine the adequacy of the class representatives." Radcliffe v. Experian Info. Solutions Inc.,

6 715 F.3d 1157, 1163 (9th Cir. 2013) (reversing the district court's class action settlement

7 approval). In Radcliffe, the court cast doubt, but did not rule on, "whether class representatives

8 could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement

9 value when they would receive $5,000 incentive awards." Id. at 1165.

10      In Staton, the Ninth Circuit reversed the district court's approval of a class-action settlement

11 where the incentive payments of up to $50,000 were disproportionately large as compared to class

12 members' payments averaging $16,500 for one subclass, and $1,000 for another. See 327 F.3d

13 at 948-49 & 977. The court stated that class representatives receiving special incentive awards

14 "may be more concerned with maximizing those incentives than with judging the adequacy of the

15 settlement as it applies to class members at large." Id. at 977. In such cases, "the class

16 representatives [may not] adequately represent the class." Radcliffe, 715 F.3d at 1164. The

17 Staton court, however, approvingly cited to Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998),

18 in which the Seventh Circuit allowed an incentive payment of $25,000 "in the context of a recovery

19 of more than $14 million[,]" where the plaintiff "spent hundreds of hours with his attorneys and

20 provided them with 'an abundance of information[.]'" 327 F.3d at 976 (quoting Cook, 142 F.3d at

21 1016). The Staton court favorably cited In re SmithKline Beckman Corp. Sec. Litig., 751

22 F.Supp.525, 535 (E.D. Pa. 1990), which approved "$5,000 awards for one named representative

23 of each of nine plaintiff classes involving more than 22,000 claimants in a settlement of $22

24 million[.]" 327 F.3d at 977. Recently, the Ninth Circuit explained that, "[i]n contrasting the Staton

25 facts with other cases and reversing because the Staton incentive awards were too large, we

26 looked to the number of named plaintiffs receiving incentive payments, the proportion of the

27 payments relative to the settlement amount, and the size of each payment." In re Online DVD-

28 Rental, 779 F.3d at 947 (internal quotation marks omitted).

With this guidance in mind, the court must examine whether there is a "significant disparity between the incentive awards and the payments to the rest of the class members" such that it creates a conflict of interest.  See Radcliffe, 715 F.3d at 1165.  In addition, the court takes into account the proportion of the payments relative to the settlement amount as well as other relevant factors, including "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."  Cook, 142 F.3d at 1016.

The Settlement Agreement indicates that JCPenney will not oppose class counsel's application for a $10,000 enhancement payment for plaintiff.  (See Dkt. 246-3, Settlement Agreement at ¶ 6.1.1.2).  However, they have also agreed that "[i]n the event that the Court does not approve the Class Representative Enhancement Payment, or the Court awards an amount that is less than sought, the amount that is not awarded will be available for distribution to the Class and shall not affect the validity and enforceability of the Settlement[.]"  (Id.).  Accordingly, the court considers the fairness and adequacy of the settlement without any incentive awards to the named plaintiffs.

As an initial matter, because the parties agree that the Settlement Agreement shall remain in force regardless of any service awards, the awards here are unlikely to create a conflict of interest between the named plaintiffs and absent class members.  Spann stated that at the conclusion of the final mediation session that she "agreed with [her] counsel that the settlement terms offered should be accepted in the best interests of the class and presented for the court for its review. [Her] approval of the settlement was not dependent or conditioned on the promise of any special treatment, compensation or 'enhancement award,' and [her] right to seek or request an 'enhancement award' was not depend[e]nt or conditioned upon [her] approval of the settlement."  (Dkt. 246-6, Declaration of Cynthia Spann in Support of Approval of Class Action Settlement ("Spann Decl.") at ¶ 16).

Regardless of the enhancement award the court ultimately approves, it is clear that the plaintiff in this action has taken on substantial responsibility in litigating this case, and the class has benefitted from the time and effort she spent doing so.  (See, e.g., Spann Decl. at ¶¶ 5-15)

(describing her review of complaint drafts and other filings, her active participation in written

discovery and preparation for her deposition, monitoring of the litigation and communication with

counsel, in-person and telephonic participation in mediation sessions and settlement discussions,

and review of the mediator's proposal and ultimate settlement).  While a disparity may exist

between the award plaintiff receives and the potential monetary awards to absent class members,

the court does not believe, under the circumstances here, that such disparity rises to the level of

unduly preferential treatment.  On the contrary, the additional payment – with her request only

amounting to less than a quarter of one percent of the $50 million settlement fund – is warranted

based on Spann's role in protecting the interests of the class and ensuring that the class benefits

from the litigation.  See In re Online DVD-Rental, 779 F.3d at 947-48 (approving incentive awards

that were roughly 417 times larger than $12 individual awards because the awards were

reasonable, the number of representatives was relatively small, and the total amount of incentive

awards "ma[d]e up a mere .17% of the total settlement fund").

        D.      The Opt-Out Threshold is Reasonable.

        Finally, the court notes that the Settlement Agreement provides that "JCPenney, at its sole

discretion, has the right to terminate this Settlement pursuant to the terms of the confidential

Supplemental Agreement Regarding Opt Outs [Confidential Agreement]."  (See Dkt. 246-3,

Settlement Agreement at ¶ 9.4).  Pursuant to the oral argument on December 3, 2015, the parties

provided the Confidential Agreement to the court under seal.  The agreement sets a threshold

level of opt-outs which, if reached, permits JCPenney to withdraw from the Settlement Agreement.

Having reviewed the Confidential Agreement, the court finds that the opt-out threshold is

reasonable, and, given the circumstances of this case and the parties involved, they need not

disclose it to the class.  See, e.g., In re Skelaxin (Metaxalone) Antitrust Litig., 2015 WL 1486709,

*2 (E.D. Tenn. 2015) (granting motion to seal opt out threshold); In re Remeron End-Payor

Antitrust Litig., 2005 WL 2230314, *18 (D. N.J. 2005) (sealing of the opt-out threshold agreed to

by court, attorneys general, and class counsel); In re HealthSouth Corp. Securities Litig., 334 Fed.

Appx. 248, 250 n. 4 (11th Cir. 2009) (holding that the opt-out threshold "is typically not disclosed

and is  kept confidential to encourage settlement and discourage third parties from soliciting class

1  members to opt out"); In re Warfarin Sodium Antitrust Litig., 2012 F.R.D. 231, 253 (D. Del. 2002)

2  (holding that the opt-out threshold was "irrelevant to members' opt-out decision").

3       As the court recognized in In re Skelaxin, "at worst, [publicizing the threshold] could result

4  in the failure of the Settlement to become effective. At best, it could result in settlement proceeds

5  being unfairly channeled away from the proposed Settlement Class members to parties and

6  attorneys who do not deserve them."  2015 WL 1486709, at *2.  The risk is particularly acute in

7  this case because, as the court and parties recognized during the oral argument, the size of the

8  settlement and the fact that defendant is a well-known company likely mean that this settlement

9  will generate attention and interest from many consumers and their attorneys.  Additionally, the

10  Ninth Circuit recently approved the confidentiality of an opt-out threshold in a class settlement

11  similar to this one.  In re Online DVD Rental, Wal-Mart and the class agreed that Wal-Mart, at

12  its sole discretion, had the right to terminate the settlement pursuant to the terms of the parties'

13  confidential agreement regarding opt-outs.  See 779 F.3d at 948.  An objector argued that the

14  confidential provision rendered the agreement unfair, but the Ninth Circuit approved of the whole

15  settlement and noted that "[o]nly the exact threshold, for practical reasons, was kept confidential."

16  Id.  In short, the court is persuaded that the opt-out provision is fair and proper in that it supports

17  the parties in their efforts to ensure that settlement proceeds are directed to class members and

18  not diverted to other parties to the detriment of the class.

19       E.    The Proposed Class Notice and Notification Procedures Are Adequate.

20       Upon a settlement of a certified class, "[t]he court must direct notice in a reasonable

21  manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

22  Federal Rule of Civil Procedure 23(c)(2) prescribes the "best notice that is practicable under the

23  circumstances, including individual notice" of particular information.  Fed. R. Civ. P. 23(c)(2)(B)

24  (enumerating notice requirements for classes certified under Rule 23(b)(3)).

25       A class action settlement notice "is satisfactory if it generally describes the terms of the

26  settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

27  forward and be heard."  Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 575 (9th Cir.), cert.

28  denied, 543 U.S. 818 (2004) (internal quotation marks omitted).  "The standard for the adequacy

1    of a settlement notice in a class action under either the Due Process Clause or the Federal Rules

2    is measured by reasonableness." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113 (2d

3    Cir.), cert. denied, 544 U.S. 1044 (2005).  Settlement notices must "fairly apprise the prospective

4    members of the class of the terms of the proposed settlement and of the options that are open to

5    them in connection with the proceedings." Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982),

6    cert. denied, 464 U.S. 818 (1983) (internal quotation marks and brackets omitted); see Trotsky v.

7    Los Angeles Fed. Sav. & Loan Ass'n., 48 Cal.App.3d 134, 151-52 (1975) (same);  Wershba v.

8    Apple Computer, Inc., 91 Cal.App.4th 224, 252 (2001) ("As a general rule, class notice must strike

9    a balance between thoroughness and the need to avoid unduly complicating the content of the

10   notice and confusing class members.").  The notice should provide sufficient information to allow

11   class members to decide whether they should accept the benefits of the settlement, opt out and

12   pursue their own remedies, or object to its terms.  See Wershba, 91 Cal.App.4th at 251-52.

13   "[N]otice is adequate if it may be understood by the average class member."  4 Newberg on Class

14   Actions § 11:53, at p. 167 (4th ed. 2013).

15        Here, the Settlement Agreement proposes that the costs of notice and administration, in

16   an amount not to exceed $2,667,000, will be deducted from the $50 million settlement fund.  (See

17   Settlement Agreement at ¶ 6.1.1.3).  The parties have selected Heffler Claims Group ("Heffler"),

18   a firm with "expertise in all aspects of administration for consumer . . . matters" (see Dkt. 246-9,

19   Declaration of Jeanne C. Finegan in Support of Preliminary Approval of Settlement and Notice

20   Program ("Finegan Decl.") at ¶ 4), as Claims Administrator.  (See Settlement Agreement at ¶ 2.7).

21   The notice program Heffler developed for this matter utilizes a combination of individual notice to

22   known class members in the form of Email Notices and Post-Card Notices and a schedule of

23   publication notices in English and Spanish in magazines, on certain internet networks, on

24   Facebook, and in a press release.  (See Dkt. 246-9, Finegan Decl. at ¶ 21).  Heffler anticipates

25   that the notices will reach 75% of targeted potential class members, on average, 2.3 times.  (See

26   id. at ¶ 39).

27        The Email Notice, which describes the nature of the action, including the class claims, (see

28   Dkt. 255, Amended Exhibits to Settlement Agreement in Support of Motion for Modification of

Class Certification Order; Preliminary Approval of Settlement; and Establishment of Qualified Settlement Fund ("Amended Exhibits"), Exh. 2 ("Email Notice")), will be sent out to the settlement class members for whom JCPenney has an email address.  (See Dkt. 246-3, Settlement Agreement at ¶ 7.1).  The Email Notice also states that the notice was sent "because JCPenney's records indicate that [the recipient is] an eligible class member who purchased" private or exclusive branded items.  (See Dkt. 255, Email Notice at 1).  It also informs the recipient that he or she has been assigned a unique customer ID number, which the individual can enter on the settlement website to review qualifying purchases and upload evidence of additional purchases.  (See id.).

Attached to the Email Notice is a longer-form notice presented in question-and-answer format.  (See Dkt. 255, Email Notice at 2-6).  There, the class definition is conspicuously included in a section entitled, "How do I know if I am part of the settlement class?," and a following section explains that benefits may be available to certain customers, and directs class members to the settlement website for more information and for a complete copy of the Settlement Agreement.  (See id. at 3-4).  The document also includes an explanation that lays out the class members' options under the settlement: they may remain in the class, exclude themselves, or object.  (See id. at 4); see also Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi).  It also provides that class members may elect to exclude themselves by completing and submitting online or mailing a simple Opt-Out Form, which will be available by phone and on the settlement website.  (See id.).  The Email Notice also states that if class members choose to object to the settlement, they may object by submitting their written objections to the court, and they may attend the final approval hearing.  (See id. at 4-5); see also Fed. R. Civ. P. 23(c)(2)(B)(iv).  Finally, the Email Notice explains that all members of the class will release all claims that relate to the claims or issues asserted in the lawsuit, and directs class members to the "Release of Claims" section of the Settlement Agreement for additional information.  (See id. at 5).

For all settlement class members whose Email Notice was not deliverable, or for whom JCPenney does not have an email address, a Post-Card Notice will be mailed by first class mail.  (See Settlement Agreement at ¶ 7.1; see also Dkt. 255, Amended Exhibits, Exh. 3 ("Post-Card

1    Notice")).  The Post-Card Notice provides a summary of the information described in the preceding

2    paragraphs and directs class members to the website for further information.   (See id.).

3    Importantly, the Post-Card Notice contains the same language as the Email Notice informing

4    recipients that "JCPenney's records indicate that [the recipient is] an eligible class member who

5    purchased JCPenney private or exclusive branded clothing or accessories[,]" and it provides

6    customers with their unique ID numbers.  (See id.).  Information regarding class members' options

7    to opt out or object, as well as the date and time of the final fairness hearing, is also included.

8    (See id.).

9       To supplement the reach of the notices sent out to class members directly, Heffler will issue

10    all elements of the publication notice "on the soonest practicable date" after the Email and Post-

11    Card Notices are sent, "but in no event shall it commence more than ten (10) days later."  (See

12    Dkt. 246-3, Settlement Agreement at ¶ 7.3).  The design and format of these materials are clear;

13    they feature bold headlines to capture attention, Spanish language options, concise plain

14    language, and embedded links to allow immediate access to more detailed information.  (See Dkt.

15    255, Email Notice & Post Card Notice; see also Dkt. 246-3, Exh. 4 ("Publication Notice").  The

16    Settlement Administrator confirms that the program is "reasonably calculated to provide notice that

17    is consistent with best practicable court approved notice programs in similar matters, and which

18    are consistent with the Federal Judicial Center's guidelines concerning appropriate reach."  (See

19    Dkt. 246-9, Finegan Decl. at ¶ 39).

20       Based on the foregoing, the court finds that there is no alternative method of distribution

21    that would be more practicable here, or any more reasonably likely to notify the class members.

22    Under the circumstances, the court finds that the procedure for providing notice and the content

23    of the class notice constitute the best practicable notice to class members.

24                           **CONCLUSION**

25       Based on the foregoing, IT IS ORDERED THAT:

26       1.   The Motion for Modification of Class Certification Order; Preliminary Approval of

27    Settlement; And Establishment of Qualified Settlement Fund **(Document No. 246)** is **granted**

28    upon the terms and conditions set forth in this Order.

1    2.  The court modifies the previously-certified class definition, so that the class is now

2 defined as set forth in ¶ 2.31 of the Settlement Agreement (Document No. 246-3), for the purposes

3 of settlement.

4    3.  The court preliminarily finds that the terms of the Settlement Agreement are fair,

5 reasonable and adequate, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6    4.  The proposed manner of the notice of settlement set forth in the Settlement Agreement,

7 as set forth in the Amended Exhibits (Document No. 255), constitutes the best notice practicable

8 under the circumstances and complies with the requirements of Due Process.

9    5.  The court approves the form, substance, and requirements of the Email Notice

10 (Document No. 255, Exh. 2); the Post-Card Notice (id., Exh. 3); the Publication Notice (Document

11 246-3, Exh. 4); and the Claim Form (id., Exh. 5).

12    6.  Heffler Claims Group LLC ("Heffler") is hereby appointed as the Claims Administrator.

13 Promptly following entry of this Order, Heffler will prepare final versions of the notice and claim

14 forms, incorporating the relevant dates and deadlines set forth in this Order and the Settlement

15 Agreement, and will commence the notice process in accordance with the Settlement Agreement.

16    7.  The parties shall establish a Qualified Settlement Fund ("QSF") in accordance with the

17 terms of the Settlement Agreement.  Heffler is hereby appointed the trustee of the QSF. JCPenney

18 is hereby ordered to transfer to Heffler, in its capacity as trustee, the required portions of the class

19 settlement amount to be held in the QSF pursuant to the terms of the Settlement Agreement.

20    8.  The parties shall carry out the settlement and claims process according to the terms of

21 the Settlement Agreement.

22    9.  Plaintiff shall file a motion for an award of class representative service payment and

23 attorney's fees and costs no later than **May 19, 2016,** and notice it for hearing for the date final

24 fairness hearing set forth below.

25    10. Class members shall submit claims, requests for exclusion, or objections to the

26 settlement and/or plaintiff's motion for an award of class representative service payments and

27 attorney's fees and costs, no later than **June 30, 2016.**

28

11.  In the event any objections or opposition to the motion for an award of class representative service payment and attorney's fees and costs are filed, class counsel shall, no later than **July 28, 2016**, file a reply addressing the objections.

12.  The parties shall file and serve a motion for final approval of the Settlement and any response to objections to the Settlement no later than **July 28, 2016**, and notice it for hearing on the date set forth in paragraph 13 below.

13.  A final approval (fairness) hearing is hereby scheduled for **August 25, 2016**, at **10:00 a.m.** in Courtroom 22, to consider the fairness, reasonableness, and adequacy of the Settlement Agreement as well as the award of attorney's fees and costs to class counsel, and service awards to the class representatives.

Dated this 25th day of January, 2016.

/s/
Fernando M. Olguin
United States District Judge