**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| CYNTHIA E. SPANN, on behalf of herself and others similarly situated, | ) ) ) | Case No. SA CV 12-0215 FMO (KESx) |
| Plaintiff, | ) ) | **ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION** |
| v. | ) ) | **SETTLEMENT; MOTION FOR ATTORNEY'S FEES, COSTS, AND CLASS** |
| J.C. PENNEY CORPORATION, a Delaware Corporation, et al., | ) ) ) | **REPRESENTATIVE ENHANCEMENT PAYMENT** |
| Defendants. | ) ) | |

Having reviewed and considered all the briefing filed with respect to plaintiff's Motion for Final Approval of Class Action Settlement (Dkt. 268-1, "Motion") and Unopposed Motion for Attorneys' Fees, Litigation Costs and Class Representative's Enhancement Payment (Dkt. 248-1, "Fees Motion"), along with the oral argument presented during the final fairness hearing held on August 25, 2016, the court concludes as follows.

## INTRODUCTION

Plaintiff Cynthia Spann ("plaintiff") filed this action, individually and on behalf of others similarly situated, against JCPenney Corporation, Inc. ("JCPenney" or "defendant") on February 8, 2012. (See Dkt. 257, Court's Order of January 25, 2016, at 1).[1] The Fourth Amended

---

[1] In citations to the record, capitalization, emphasis, internal alteration marks, and internal quotation marks may be altered or omitted without notation.

1   Complaint ("4AC"), the operative complaint in this matter, alleges five causes of action for (1)

2   unfair, (2) fraudulent, and (3) unlawful business practices in violation of Cal. Bus. & Prof. Code §§

3   17200, et seq. ("UCL"); (4) false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et

4   seq. ("FAL"); and (5) violations of the California Consumers Legal Remedies Act, Cal. Civ. Code

5   §§ 1750, et seq. ("CLRA").  (See Dkt. 160, 4AC at ¶¶ 56-90).  The court granted plaintiff's motion

6   for class certification on May 18, 2015, appointing class counsel and plaintiff as representative of

7   the class.  (See Dkt. 257, Court's Order of January 25, 2016, at 2).  Specifically, the certified class

8   was defined as

9           [a]ll persons who, while in the State of California between November 5, 2010

10          and January 31, 2012 who purchased from JCPenney one or more private

11          or exclusive branded items of apparel or accessories advertised at a discount

12          of at least 30% off of the stated "original" or "regular" price, and who have not

13          received a refund or credit for their purchases.

14          Excluded from the class are defendant, as well as its officers, employees,

15          agents or affiliates, and any judge who presides over this action, as well as

16          all past and present employees, officers and directors of JCPenney.  Also

17          excluded is any person who only received a discount of 30% or more as a

18          result of using one or more coupons.

19  (Id.).

20          The parties engaged in substantial settlement negotiations throughout the course of the

21  litigation and finally settled the case in September, 2015.  (See Dkt. 257, Court's Order of January

22  25, 2016, at 2).  Subsequently, the court modified the previously-certified class definition, granted

23  preliminary approval of the settlement, appointed Heffler Claims Group LLC ("Heffler") as the

24  claims administrator, and directed Heffler to provide notice to the class members.  (See id. at 30-

25  32).  The court set the final approval hearing for August 25, 2016.  (See id. at 32).  Plaintiff now

26  seeks (1) final approval of the settlement; (2) attorney's fees and costs; and (3) a service award

27  for  plaintiff.  (See Dkt. 268-1, Motion at 25; Dkt. 248-1, Fees Motion at 1).

28

**BACKGROUND**

I.     PLAINTIFF'S CLAIMS.

This case arises from plaintiff's March 5, 2011, visit to a JCPenney store in Brea, California. (See Dkt. 160, 4AC at ¶ 18).  During that visit, "in reliance on [JCPenney's] false and deceptive advertising, marketing and pricing schemes, [plaintiff] purchased over $200.00 in private branded and exclusive branded apparel and accessories[.]"[2] (Id.).  Plaintiff alleges that while at the store, she "observed that J.C. Penney advertised price comparisons on plastic placards above or below each product offered for sale[, and that] [o]ne column showed what was represented to be the 'original' price for each product[, and] [t]he next column showed the 'sale' price of each item." (Id. at ¶ 26).  Plaintiff "[b]eliev[ed] she was able to pay significantly less than what certain products were worth and normally sell for in the retail marketplace, [and was thereby] induced to purchase ten different items, all of which were offered at prices significantly lower than their stated original prices." (Id.).

Plaintiff asserts that, prior to February 1, 2012, "JCPenney engaged in a pervasive false advertising scheme by which it advertised 'sale' prices that were substantially lower than comparative 'regular' or 'original' prices for its private and exclusive branded apparel and accessories." (Dkt. 257, Court's Order of January 25, 2016, at 3).  According to plaintiff, the "higher 'regular' and 'original' prices (and implied savings) were false and deceptive because JCPenney hardly, if ever, offered, sold or intended to sell its merchandise at those prices." (Id.).  JCPenney "temporarily stopped using false price comparisons on February 1, 2012 when it initiated a 'fair and square' pricing campaign but, after a significant decline in revenues, it returned to its original scheme, at least for some products, in early 2013." (Id.).

II.    SETTLEMENT AGREEMENT.

In the summer of 2013, the parties began negotiations regarding the structure of a class-wide settlement.  (See Dkt. 257, Court's Order of January 25, 2016, at 3).  No settlement was

---

[2]    Private brands are brands that JCPenney owns, designs, and develops, and exclusive brands are outside brands that are sold exclusively at JCPenney. (See Dkt. 257, Court's Order of January 25, 2016, at 3 n. 1).

reached at that time, but the parties "periodically engaged in informal settlement negotiations" over the course of the following two years.  (See id. at 3-4.  In July 2015, the parties conducted additional settlement negotiations and reached a settlement in September 2015.  (See id. at 4).

The settlement expanded the definition of the class from that previously certified, (see Dkt. 268-3, Settlement Agreement at ¶ 2.31) (defining the term "Settlement Class")), and defined the class as follows:

> all persons who, while in the State of California and between November 5, 2010 and January 31, 2012, and between January 1, 2013 through December 31, 2014, purchased from JCPenney one or more private or exclusive branded items of apparel or accessories at a discount of at least 30% off the stated "original" or "regular" price, and who have not received a full refund or credit for their purchases.  Excluded from the Settlement Class are Defendant, as well as its officers, employees, agents or affiliates, and any judge who presides over this action, as well as all past and present employees, officers and directors of JCPenney.

(Id.; see also Dkt. 257, Court's Order of January 25, 2016, at 4 & 31 (preliminarily approving the revised definition of the settlement class)).

The parties have agreed that JCPenney will establish a $50,000,000.00 settlement fund, which will include both a Cash Component and a Class Allocation.  (See Dkt. 268-3, Settlement Agreement at ¶ 6.1).  The Cash Component will cover reasonable attorney's fees and costs, a reasonable class representative enhancement payment, and notice and administration costs.  (See id. at ¶¶ 6.1.1.1-3).  The portion of the settlement fund not used for the Cash Component will comprise the Class Allocation, which will be provided to class members in JCPenney store credit or cash.  (See id. at ¶ 6.1.2).  The amount of store credit or cash that each claimant receives will be determined using a system of points based on the value of each class member's qualifying transactions.  (See id. at ¶¶ 6.1.2.1 & 6.1.2.1.4).  For example, claimants with total purchase

amounts[3] between:  $1-100 will be assigned two points; $101-200 will be assigned three points; $201-300 will be assigned four points; and so forth, with a maximum of ten points for claimants with purchase amounts above $800.  (See id. at ¶ 6.1.2.1.4).  Once each claimant is assigned his or her points, those points will be divided by the total points of all claimants who submit timely and valid claim forms.  (See id. at ¶ 6.1.2.1).  The quotient shall be the percentage of the Class Allocation that each claimant will receive.  (See id.).  As stated above, claimants may elect to receive cash or JCPenney store credit, which will not expire and can be used with any other promotion, discount, or coupon.  (See id. at ¶ 2.37).

The settlement also includes non-monetary relief.  Defendant agrees that going forward, "its advertising and pricing practices . . . will not violate Federal or California law, including California's specific price-comparison advertising statutes."  (Dkt. 268-3, Settlement Agreement at ¶ 6.1.7).  "Specifically, JCPenney agrees that any former price to which JCPenney refers in its price comparison advertising will be the actual, bona fide price at which the item was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith."  (Id.).  Additionally, JCPenney has agreed to "implement a compliance program, which will consist of periodic (no less than once a year) monitoring, training and auditing to ensure compliance with California's price comparison laws."  (Id.).

III.   NOTICE TO CLASS.

Pursuant to the Court's Order of January 25, 2016, Heffler, the court-approved claims administrator, prepared and disseminated the class notice, located and updated addresses for class members, monitored requests for exclusion, set up a settlement-related website and toll-free

---

[3] Total purchase amounts will be determined in a number of ways.  First, the transaction data for all known and identifiable class members will be supplied by JCPenney to the claims administrator, who will provide such class members with a unique identification number that they can enter on the settlement website to view the date and purchase amount of their transactions. (See Dkt. 268-3, Settlement Agreement at ¶ 6.1.2.1.2). Second, claimants who believe they made purchases that were not identified by JCPenney, or who believe that their data is incomplete or inaccurate, may submit receipts demonstrating qualified purchases, which may increase their allocation points.  (See id. at ¶ 6.1.2.1.3).  Finally, claimants who certify under penalty of perjury that they are members of the class, but do not have receipts, and for which there is no information in JCPenney's database, will receive one point.  (See id. at ¶ 6.1.2.1.4).

telephone service, and received, processed, and reviewed claim forms.  (See Dkt. 268-5, Declaration of James R. Prutsman in Support of Motion for Final Approval of Class Action Settlement ("Prutsman Decl.") at ¶ 2).

On February 24, 2016, Heffler established a toll-free number for class members to obtain claim forms and additional information about the settlement.  (See Dkt. 268-5, Prutsman Decl. at ¶ 22).  The toll-free number provided recorded and live information.  (See id.).  As of July 27, 2016, Heffler had responded to 36,827 telephone calls inquiring about the case or the settlement.  (Id.).

On February 26, 2016, based on data obtained from JCPenney, Heffler caused the class notice to be sent to 2,617,205 class members via email, of which 1,346,184 were successfully delivered.  (See Dkt. 268-5, Prutsman Decl. at ¶¶ 13 & 17; see also Dkt. 268-10, "Email Notice").  Due to the inadvertent inclusion of emails of JCPenney employees who were expressly excluded from the settlement, as well as the failure to include a subject line in some of the emails, Heffler re-sent the Email Notice to 2,583,238 class members on March 15, 2016.[4]  (See Dkt. 268-5, Prutsman Decl. at ¶¶ 15-16).

On or about March 15, 2016, Heffler mailed 4,286,776 Postcard Notices to class members for whom there was no email address or whose Email Notice was returned as undeliverable.  (See Dkt. 268-5, Prutsman Decl. at ¶ 18; see also Dkt. 268-11, "Post-Card Notice").  Of the 259,021 Post-Card Notices returned as undeliverable, Heffler updated and re-mailed the notices to 4,922 class members.  (See Dkt. 268-5, Prutsman Decl. at ¶ 20).  In total, Heffler successfully emailed 1,758,050 Email Notices and mailed or re-mailed 4,034,025 Post-Card Notices.  (Id. at ¶ 21).

Heffler also developed and maintained a website for the settlement located at www.jcpenneysettlement.com. (Dkt. 268-5, Prutsman Decl. at ¶¶ 2 & 23).  The website contains, among other things, a Long Form Notice, Claim Form, Opt-Out Request, a Frequently Asked Questions ("FAQs") section, the Settlement Agreement, the complaint, the declarations and exhibits submitted in connection with the motion for preliminary approval, and the Fees Motion,

---

[4]  Excluded from this email notice were JCPenney employees, class members who had already submitted a claim, and 4,480 class members who requested that they not receive any further emails regarding this litigation.  (See Dkt. 268-5, Prutsman Decl. at ¶ 16).

along with supporting documents.  (See Dkt. 268-5, Prutsman Decl. at ¶¶ 24-25; see also Dkt. 268-12 (Long Form Notice); Dkt. 268-13 (Claim Form); Dkt. 268-3, Settlement Agreement at Exh. 5 (Out-Out Form); Dkt. 268-14 (FAQs)).  The website also contains case deadlines, including the June 30, 2016, deadline for submitting Claim Forms, requesting exclusion, and making objections, (see Dkt. 268-5, Prutsman Decl. at ¶ 25; Dkt. 257, Court's Order of January 25, 2016, at 31), and notice of the August 25, 2016, final fairness hearing.  (Dkt. 268-5, Prutsman Decl. at ¶ 25; Dkt. 257, Court's Order of January 25, 2016, at 32).  The website allows class members to print forms, submit claims for store credit in lieu of cash payment, upload proof of additional qualifying purchases, and submit Opt-Out Requests.  (Dkt. 268-5, Prutsman Decl. at ¶ 26).  As of July 27, 2016, the website had 363,946 visits.  (Id. at ¶ 27).

Between March 25, 2016, and April 24, 2016, banner ads directing potential class members to the settlement website appeared on three internet networks and on Facebook.  (Dkt. 268-5, Prutsman Decl. at ¶ 6; see also Dkt. 268-6 (sample banner ads)).  Also, a summary notice was published once in the California editions of People Magazine and Sunset Magazine, (see Dkt. 268-5, Prutsman Decl. at ¶ 8; Dkt. 268-7 (sample ads)), and in seven local Spanish newspapers in California between April 6 and April 10, 2016.  (See Dkt. 268-5, Prutsman Decl. at ¶ 9; Dkt. 268-8 (sample Spanish-language ads)).  Finally, a press release was issued in English and Spanish on March 25, 2016, over PR Newswire US1 full national wire.  (See Dkt. 268-5, Prutsman Decl. at ¶ 10; Dkt. 268-9 (Press Release)).

As of July 27, 2016, Heffler received 60,985 timely paper claims and 98,037 electronic claims for a total of 159,022 claims.  (See Dkt. 268-5, Prutsman Decl. at ¶ 29).  Of those, 102,502 requested store credit, 56,089 requested a cash payment, and 431 had not yet been processed.  (See id.).  Assuming a Class Allocation fund of $33,631,919.09, the 158,787 claimants will get an average payout of $211.81, although the actual amount for each claimant will vary depending on the total number of valid claims and the number of points assigned based on the allocation plan provided in the Settlement Agreement.  (See id. at ¶ 31).

As of July 27, 2016, Heffler received 809 timely exclusion requests, (see Dkt. 268-5, Prutsman Decl. at ¶ 32), and seven objections.  (Id. at ¶ 33).

**LEGAL STANDARD**

Federal Rule of Civil Procedure 23[5] provides that "the claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties."  Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F., 688 F.2d 615, 624 (9th Cir. 1982), cert. denied, 459 U.S. 1217 (1983).  Whether to approve a class action settlement is "committed to the sound discretion of the trial judge[,]" Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, 506 U.S. 953 (1992), who must examine the settlement for "overall fairness." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  Neither district courts nor appellate courts "have the ability to delete, modify or substitute certain provisions.  The settlement must stand or fall in its entirety."  Id. (internal quotation marks and citations omitted).

In order to approve a settlement agreement in a class action, the court must conduct a three-step inquiry.  First, it must assess whether defendants have met the notice requirements under CAFA.  See 28 U.S.C. § 1715(d).  Second, it must determine whether the notice requirements of Rule 23(c)(2)(B) have been satisfied.  Finally, it must conduct a hearing to determine whether the settlement agreement is "fair, reasonable, and adequate." See Fed. R. Civ. P. 23(e)(2); Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003) (discussing the Rule 23(e)(2) standard); Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d 964, 972 (E.D. Cal. 2012) (conducting three-step inquiry).

In determining whether a settlement agreement is fair, adequate, and reasonable, the court must weigh some or all of the following factors:  "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

---

[5]  All "Rule" references are to the Federal Rules of Civil Procedure.

1  presence of a governmental participant; and (8) the reaction of the class members of the proposed

2  settlement." In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011).

3  However, when "a settlement agreement is negotiated prior to formal class certification,

4  consideration of these eight . . . factors alone is not enough to survive appellate review."

5  Bluetooth, 654 F.3d at 946 (emphasis in original). This is because "[p]rior to formal class

6  certification, there is an even greater potential for a breach of fiduciary duty owed the class during

7  settlement." Id. District courts, therefore, also must determine "that the settlement is not the

8  product of collusion among the negotiating parties." Id. at 947 (internal quotation and alteration

9  marks omitted). In making that determination, courts should look for signs of collusion, including

10  "(1) when counsel receive a disproportionate distribution of the settlement, or when the class

11  receives no monetary distribution but class counsel are amply rewarded[;]" "(2) when the parties

12  negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and

13  apart from class funds[;]" and "(3) when the parties arrange for fees not awarded to revert to

14  defendants rather than be added to the class fund[.]" Id. at 947 (internal quotation marks and

15  citations omitted).

16  **DISCUSSION**

17  I.    FINAL APPROVAL OF CLASS SETTLEMENT.

18  A.    Class Action Fairness Act.

19  When a settlement is reached in a class action case, CAFA requires that "[n]ot later than

20  10 days after a proposed settlement of a class action is filed in court, each defendant that is

21  participating in the proposed settlement shall serve [notice of the proposed settlement] upon the

22  appropriate State official of each State in which a class member resides and the appropriate

23  Federal official[.]"  28 U.S.C. § 1715(b).  The statute provides detailed requirements for the

24  contents of such a notice, which must include, among other things, "any proposed or final

25  notification to class members[,]" and "any proposed or final class action settlement[.]" See id. at

26  § 1715(b)(3) & (4). The court is precluded from granting final approval of a class action settlement

27  until the CAFA notice requirement is met. See id. at § 1715(d) ("An order giving final approval of

28  a proposed settlement may not be issued earlier than 90 days after the later of the dates on which

the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b)]").

Here, Heffler provided the required CAFA notice. (See Dkt. 268-5, Prutsman Decl. at ¶ 5). As of July 27, 2016, Heffler had not received any objections or comments on the settlement. (See id.).

B.    Class Certification.

In its order granting preliminary approval, the court certified the modified class pursuant to Rule 23(b)(3).  (See Dkt. 257, Court's Order of January 25, 2016, at 9-15 & 31).  Because circumstances have not changed, and for the reasons set forth in its Order of January 25, 2016, the court hereby affirms its order certifying the class for settlement purposes under Rule 23(e). See In re Apollo Grp. Inc. Sec. Litig., 2012 WL 1378677, *4 (D. Ariz. 2012) ("The Court has previously certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and hereby reconfirms its order certifying a class.").

C.    Rule 23(c) Notice Requirements.

Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), and upon settlement of a certified class, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice" of particular information.   Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

After undertaking the required examination, the court approved the form of the proposed class notice. (See Dkt. 257, Court's Order of January 25, 2016, at 27-30).  As discussed above, Heffler sent the class notice and related forms to potential class members via email and mail. (See Dkt. 268-5, Prutsman Decl. at ¶¶ 13-21; Dkt. 268-10 (Email Notice); Dkt. 268-11 (Post-Card Notice)).  Heffler also publicized the settlement in English and Spanish in magazines, certain internet networks, on Facebook, and in a press release. (See Dkt. 268-5, Prutsman Decl. at ¶¶ 6-10).  Accordingly, based on its prior findings and the record before it, the court finds that the class notice and the notice process fairly and adequately informed class members of the nature

of the action, the terms of the proposed settlement, the effect of the action and release of claims, their right to exclude themselves from the action, and their right to object to the proposed settlement.  (See Dkt. 257, Court's Order of January 25, 2016, at 27-30).

        D.     Whether the Class Settlement is Fair, Adequate and Reasonable.

              1.     **The Strength of Plaintiff's Case, and the Risk, Expense, Complexity, and Duration of Further Litigation**.

In evaluating the strength of the case, the court should assess "objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach [a settlement agreement]."  Adoma, 913 F.Supp.2d at 975.  "In assessing the risk, expense, complexity, and likely duration of further litigation, the court evaluates the time and cost required."  Id. at 976.

Here, the parties reached a settlement with the assistance of private mediators, (see Dkt. 257, Court's Order of January 25, 2016, at 18), and "thoroughly investigated and considered their own and the opposing party's positions."  (Id.).  As the court previously noted, "the parties clearly had a sound basis for measuring the terms of the Settlement Agreement against the risks of continued litigation, and there is no evidence that the agreement is the product of fraud or overreaching by, or collusion between, the negotiating parties."  (Id.) (quoting Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009)).  While plaintiff expresses confidence in her ability to prevail at trial, (see Dkt. 268-1, Motion at 9), "there is a very real risk that plaintiff could recover nothing" even if she "were to prevail at trial[.]"  (Dkt. 257, Court's Order of January 25, 2016, at 21).  Indeed, the court previously outlined the forms of restitution sought by plaintiff, (see id. at 21-22), and explained that "[t]here are risks with respect to each of plaintiff's proposed measures of restitution."  (Id. at 21).  Plaintiff asserts that the measure of damages or restitution "was perhaps the most hotly litigated issue in [the] case; even more than the question of liability."  (Dkt. 268-1, Motion at 10).  Thus, despite a strong liability case, plaintiff elected to settle the case given the uncertainty of recovery.  (See id. at 10-11).

Additionally, as the court recognized, the parties were litigating and negotiating "under a huge cloud of uncertainty concerning JCPenney's financial stability" given its financial losses

following its move to a non-comparative pricing scheme in 2013.  (See Dkt. 257, Court's Order of January 25, 2016, at 22).  This factor strongly supports the reasonableness of the settlement. (See id.); see also Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993), cert. denied, 512 U.S. 1220 (1994) ("Here one factor predominates to make clear that the district court acted within its discretion [in approving the settlement].  That factor is [defendant's] financial condition.").  Finally, the court found that if plaintiff recovered anything, "it may take years to complete the appeals that would likely follow entry of judgment."  (Dkt. 257, Court's Order of January 25, 2016, at 22).

In sum, even if plaintiff successfully proved her liability case at trial, the amount of restitution recovered – if any – could vary widely depending on a number of factors, including the court's discretion as to whether and how much to award in restitution, discovery and analysis regarding the appropriate method by which to calculate such an award, and JCPenney's ability to satisfy a judgment awarding the maximum amounts sought by plaintiff.  (See Dkt. 257, Court's Order of January 25, 2016, at 22).  Adding the duration of any likely appeals to this mix of factors renders the settlement exceptional.

2.      **The Risk of Maintaining Class Action Status through Trial**.

Although the court certified a class prior to settlement, (see Dkt. 209, Court's Order of May 18, 2015, at 38), and has preliminary certified the modified class, (see Dkt. 257, Court's Order of January 25, 2016, at 31), plaintiff nonetheless faced the risk that the court could de-certify the class, either by way of a motion to de-certify or on its own motion.  Thus, this factor weighs in favor of granting final approval.

3.      **The Amount Offered in Settlement**.

"[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted).  In granting preliminary approval of the Settlement Agreement, the court concluded that the total settlement amount of $50,000,000 was fair, reasonable, and adequate in light of the litigation risks in the case.  (See Dkt. 257, Court's Order

of January 25, 2016, at 18 & 31).  Accordingly, this factor also weighs in favor of granting final approval.

4.     **The Extent of Discovery Completed and Stage of Proceedings**.

"A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."  Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004).  "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case."  Id. at 527.  The court previously examined these factors at length, (see Dkt. 257, Court's Order of January 25, 2016, at 16-18), noting that "this matter was hard fought and contentiously litigated[,]" (id. at 16), over a three-year period.  (See id. at 3-4).  In addition to the substantial discovery conducted by the parties, the parties engaged in extensive motion practice, including motions for summary judgment and motions for class certification.  (See id. at 17).  In short, the parties entered the settlement discussions with a substantial understanding of the factual and legal issues from which they could advocate for their respective positions.  See Nat'l Rural Telecomms., 221 F.R.D. at 527-28 (noting that parties' examination of the factual and legal bases of the disputed claims through completion of discovery "strongly militates in favor of the Court's approval of the settlement"); Barbosa v. Cargill Meat Solutions Corp., 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("What is required is that sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently.") (internal quotation marks omitted).  This factor also warrants approval of the settlement.

5.     **The Experience and Views of Counsel**.

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.  This is because the parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation."  Nat'l Rural Telecomms., 221 F.R.D. at 528 (internal quotation marks and citation omitted).  The court previously noted that class counsel are experienced class action attorneys who prosecuted this action vigorously.  (See Dkt. 209, Court's

Order of May 18, 2015, at 13; see also Dkt. 248-2, Declaration of Matthew J. Zevin in Support of Unopposed Motion for Attorneys' Fees, Litigation Costs and Class Representative's Enha[n]cement Payment ("Zevin Fees Decl.") at ¶¶ 3 & 8 (describing class counsel's extensive experience and efforts in prosecution this action)).   Class counsel recommend approval of the settlement.  (See Dkt. 268-1, Motion at 14).   Accordingly, the court finds that this factor also supports approval of the settlement.

>                   6.      **The Presence of a Government Participant**.

There is no government participant in this matter.  Accordingly, this factor is not relevant. See Wren v. RGIS Inventory Specialists, 2011 WL 1230826, *10, supplemented by 2011 WL 1838562 (N.D. Cal. 2011) (noting that lack of government entity involved in case rendered this factor inapplicable to the analysis).

>                   7.      **The Reaction of Notified Class Members to the Proposed Settlement**.

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  Nat'l Rural Telecomms., 221 F.R.D. at 529.  Here, Heffler successfully emailed 1,758,050 Email Notices and mailed 4,034,025 Post-Card Notices.  (See Dkt. 268-5, Prutsman Decl. at ¶ 21).  Thus, a total of 5,792,075 class members received direct notice of the settlement.[6]  In response to the notice program, at least 159,022 class members submitted claims, (see id. at ¶ 29), representing a claim rate of approximately 2.75% of those who received direct notice.  Such a claim rate is reasonable given the facts of this case, namely that direct notice could not be provided to more than half of the class.  See In re Toys R Us-Delaware, Inc. - (FACTA) Litig., 295 F.R.D. 438, 468 n. 134 (C.D. Cal. 2014) (citing source for proposition that claim rates in consumer litigation generally range from two to 20 percent, but when direct notice is not possible for the entire class, "claims filing may be depressed"); Couser v. Comenity Bank, 125 F.Supp.3d 1034, 1044 (S.D. Cal. 2015) (noting that a claim rate of 7.7% was "large" and

---

[6]  Plaintiff notes that this number may be inflated due to overlap between class members receiving both the Email Notice and the Post-Card Notice.  (See Dkt. 268-1, Motion at 15).

"higher than average"); see also In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 941 (9th Cir. 2015) (upholding settlement in which the parties sent direct notice to 35,000,000 class members and received 1,183,444 claims, which represents a 3.4% claim rate).

Only 809 class members requested exclusion, (see Dkt. 268-5, Prutsman Decl. at ¶ 32), which is 0.014% of those who received notice, (see Dkt. 268-1, Motion at 15), and only seven class members filed objections to the settlement, (see Dkt. 268-5, Prutsman Decl. at ¶ 33), which represents 0.0001% of those who received notice of the settlement. (See Dkt. 268-1, Motion at 15). Not only is the percentage of objections extremely low but, as discussed below, the objections are without merit and do not, in any way, undermine the settlement.

a. *Objections Based on Merits of Lawsuit.*

Of the seven objections, three are directed at the merits of the lawsuit rather than the terms of the settlement. For instance, Sandy Bacon is critical of plaintiff's decision to file this lawsuit, stating that "[b]ecause she has no sense of her own, she blames JC Penney for her ignorance, and they have been ordered to make $50 million available to compensate all of us 'misled' buyers." (Dkt. 259, Objection of Sandy Bacon ("Bacon Obj.") at ECF 8745). Elaine Fedorka blames this litigation on "a few disgruntled customers" and opines that JCPenney did not "willfully use[] false price comparisons." (Dkt. 263, Notice of Receipt of Objection, Exh. A (Objection of Elaine Fedorka) ("Fedorka Obj.") at ECF 8770). She believes the court should "throw this case out." (Id.). Similarly, Laura Crenwelge urges the court to "dismiss the case altogether if possible [and] find in favor of JCPenney that this lawsuit has no basis[.]" (Dkt. 262, Notice of Receipt of Objection, Exh. A (Objection of Laura Crenwelge) ("Crenwelge Obj.") at ECF 8762). She explains that while this lawsuit is "ludicrous," she has not opted out of the settlement because she "might as well get [her] piece of the pie[.]"[7] (Id.). These objections are overruled since the court's duty at this stage "is to determine whether the settlement is fundamentally fair to the class, not to

_____

[7] In the alternative, Ms. Crenwelge urges the court to "drastically reduce the amount awarded in fees and costs[.]" (Dkt. 262, Crenwelge Obj. at ECF 8762).

1   reexamine the underlying merits of the litigation."[8]  Larsen v. Trader Joe's Company, 2014 WL

2   3404531, *6 (N.D. Cal. 2014).   Further, the objections are irrelevant because they are in essence

3   "objections on behalf of [JCPenney] and not the class[,]" id., and the court "is a fiduciary to absent

4   class members, not Defendant."  Dennis v. Kellogg Co., 2013 WL 6055326, *6 (S.D. Cal. 2013);

5   see Larsen, 2014 WL 3404531, at *6.

6                   b.    *Objection Based on Compliance with Settlement Agreement.*

7          Jessica Charles objects to the settlement because she asserts that, despite plaintiff's

8   counsel's representations to the court, "JCPenney continues to this day to advertise fake discounts

9   across the huge majority of its products, where the claimed sale price is actually JCPenney's

10  regular price." (Dkt. 261, Objection of Jessica Charles ("Charles Obj.") at ECF 8756).  As a result,

11  she contends that class counsel and plaintiff "have failed the class and are not adequate to

12  represent the class . . . [since i]t is clear that the attorneys have failed to thoroughly investigate

13  the case." (Id. at ECF 8757).  The court finds Ms. Charles's objection to be without merit.

14         As an initial matter, Ms. Charles fails to offer any facts or evidence supporting her assertion

15  regarding JCPenney's post-settlement conduct.  (See, generally, Dkt. 261, Charles Obj. at ECF

16  8756-57).  Ms. Charles did not provide any evidence or specify any transaction or advertised price

17  that allegedly is contrary to Federal or California law.  (See, generally, id.).  Nor did Ms. Charles

18  respond to class counsel's attempt to determine the bases for her objection.  Upon receipt of Ms.

19  Charles's objection, class counsel attempted unsuccessfully to reach her via telephone to

20  determine if she had retained counsel and what evidence she had to support her objection.[9]  (See

21  Dkt. 268-4, Emge Decl. at ¶ 3).  Despite nine telephone calls and messages left with respect to

22  each call, Ms. Charles did not return any of the calls.  (See id.).

23

24         [8]  In any event, the court has already considered the merits of this case in connection with
    defendant's motion to dismiss, (see Dkt. 202, Court's Order of March 17, 2015), and motion for

25  summary judgment, (see Dkt. 204, Court's Order of March 23, 2015), and declined to grant
    defendant's motions.

26
           [9]  Counsel also retained a process server to serve a deposition notice on Ms. Charles at the
27  address indicated in her objection, but service was unsuccessful.  (See Dkt. 268-4, Declaration
    of Derek J. Emge in Support of Motion for Final Approval of Class Action Settlement ("Emge
28  Decl.") at ¶ 3).

1    But more importantly, as plaintiff notes, neither plaintiff nor her counsel represented to the

2    court that JCPenney would no longer engage in false price comparisons.  (See Dkt. 268-1, Motion

3    at 19-20).  Rather, plaintiff merely set forth what the parties agreed to in the settlement, which

4    states in relevant part:

5              As a direct result of this Litigation, JCPenney agrees that its advertising and

6              pricing practices as of the date of this Settlement Agreement, [November 9,

7              2015,] and continuing forward, will not violate Federal or California law,

8              including California's specific price-comparison advertising statutes.

9              Specifically, JCPenney agrees that any former price to which JCPenney

10             refers in its price comparison advertising will be the actual, bona fide price at

11             which the item was openly and actively offered for sale, for a reasonably

12             substantial period of time, in the recent, regular course of business, honestly

13             and in good faith.  As a further direct result of this Litigation, JCPenney shall

14             implement a compliance program, which shall consist of periodic (no less

15             than once a year) monitoring, training and auditing to ensure compliance with

16             California's price comparison laws.

17   (Dkt. 268-3, Settlement Agreement at ¶ 6.1.7).  Thus, even if Ms. Charles's objection were true,

18   plaintiff and class counsel cannot be faulted for JCPenney's current business practices.

19        Finally, JCPenney responds that it has implemented a new price-comparison advertising

20   policy in direct response to this litigation, which has been in place since the date of the Settlement

21   Agreement.  (See Dkt. 267, J.C. Penney Corporation, Inc.'s Response to Jessica Charles'

22   Objection to Class Settlement at 2).  Pursuant to that policy, JCPenney "has created a

23   Promotional Pricing Governance Committee and has instituted regular training sessions."  (Id.).

24   JCPenney also created the position of Director of Pricing Compliance, "whose primary

25   responsibility is to monitor and ensure compliance with the new pricing policy."  (Id.).  Nowhere

26   in the Settlement Agreement, (see, generally, Dkt. 268-3, Settlement Agreement), or in the

27   settlement-approval filings, (see, generally, Dkt.), has either party represented that JCPenney

28

17

1    would not utilize any price-comparison pricing.  Instead, JCPenney agreed that such practices

2    would not violate federal or California law.  (See Dkt. 268-3, Settlement Agreement at ¶ 6.1.7).

3                    c.    *Objections to Fees and Cy Pres Recipient.*

4          The remaining three objections relate to fees and the cy pres provision of the settlement.[10]

5    (See Dkt. 260, Objection of Walter F. Ellingwood; Dkt. 264, Notice of Receipt of Objection, Exh.

6    A (Objection of Jeanelle Branch) ("Branch Obj."); Dkt. 265, Notice of Receipt of Objection, Exh.

7    A (Objection of Patrick Sweeney) ("Sweeney Obj.")).[11]   These objections have essentially been

8    addressed in connection with the Motion and Fees Motion and, in any event, lack merit.  The court

9    has scrutinized the settlement and has found it to be fair, adequate, and reasonable, see supra

10   at § I.D., and has considered the request for attorney's fees and costs, the class representative's

11   enhancement award, and administration costs, and found them to be reasonable.  See infra at §

12   II.  Moreover, despite the court inviting objectors to address the court regarding the settlement,

13   none made an appearance at the final approval hearing.

14

15   _____

16   [10]  While Ms. Crenwelge primarily takes issue with the merits of the lawsuit, she also calls the
     requested attorney's fees "absolutely ridiculous."  (See Dkt. 262, Crenwelge Obj. at ECF 8762).

17   [11]   As plaintiff notes, Mr. Sweeney is a known "serial" objector, (Dkt. 266, Plaintiff's Reply
     Memorandum in Support of Motion for Attorneys' Fees, Litigation Costs and Class
18   Representative's Enhancement Payment ("Reply") at 1, 4-5 & 7-9), and Mr. Ellingwood and Ms.
     Branch are represented by Steven Helfand, another known serial objector.  (Id. at 1 & 9-10); see,
19   e.g., Brown v. Hain Celestial Group, Inc., 2016 WL 631880, *9-10 (N.D. Cal. 2016) (stating that
     Helfand and Sweeney "are 'professional' objectors" and that "courts across the county (including
20   in the Ninth Circuit) have repeatedly turned aside their efforts to upend settlements").  Indeed, Mr.
     Sweeney is so prolific in objecting to class action settlements that the court received an objection
21   from him in a completely unrelated case, Chambers v. Whirlpool Corp., CV 11-1733 FMO (JCGx)
     (C.D. Cal.), where the final fairness hearing was held on the same day as the instant case.  In both
22   cases, his objections set forth facts unrelated to either case.  (See Dkt. 265, Sweeney Obj. at ECF
     8796 ("The Settlement consolidates several actions and precedes certification.  Class Members
23   will be compensated for a percentage of the amount they were charged for the insurance
     policies[.]"); see also Chambers, CV 11-1733 FMO (JCGx) (C.D. Cal.), Dkt. 234, Objections of
24   Patrick Sweeney to Proposed Settlement at ¶ 9 (objecting to nonexistent cy pres provision).
     Additionally, with respect to Ms. Branch, class counsel informed the court at the  fairness hearing
25   that Helfand contacted him and informed him that he did not know, was not representing, and did
     not file the objection on Ms. Branch's behalf despite his name on the caption and signature pages
26   of her objection.  As of the filing date of this Order, the court has not received any filing from Mr.
27   Helfand disavowing the objection or his representation of Ms. Branch.  (See, generally, Dkt.).
28

1          E.       Whether the Settlement is the Product of Collusion.

2          Although the court had certified a class prior to settlement, the parties sought modification

3   of the class as part of the settlement.  (See Dkt. 257, Court's Order of January 25, 2016, at 9-15

4   & 31).  In granting preliminary approval of the settlement, the court carefully scrutinized the

5   settlement and concluded that "[t]he parties clearly had a sound basis for measuring the terms of

6   the Settlement Agreement against the risks of continued litigation, and there is no evidence that

7   the agreement [was] the product of fraud or overreaching by, or collusion between, the negotiating

8   parties."  (Dkt. 257, Court's Order of January 25, 2016, at 18).

9          With respect to "signs" of collusion, the court notes that, unlike Bluetooth, where the class

10  received no monetary award, see 654 F.3d at 947, class members here will receive monetary

11  relief.  (See Dkt. 268-3, Settlement Agreement at ¶¶ 6.1, 6.1.1, 6.1.1.4 & 6.1.2).  Moreover,

12  although the Settlement Agreement contains a "clear sailing" provision,[12] (see id. at ¶ 6.1.1.1), "the

13  absence of a 'kicker provision' stating that all fees not awarded would revert to defendant[], weighs

14  against a finding of collusion."  Klee v. Nissan N. Am., Inc., 2015 WL 4538426, *10 (C.D. Cal.),

15  aff'd, Case No. 15-56201 (9th Cir. 2015); see also Bluetooth, 654 F.3d at 949 ("The clear sailing

16  provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full

17  potential benefit if class counsel negotiates too much for its fees.").  Additionally, any award of

18  attorney's fees will be paid from the same common fund, (see Dkt. 268-3, Settlement Agreement

19  at ¶¶ 6.1, 6.1.1 & 6.1.1.1), which militates against a finding of collusion.  See Betancourt v.

20  Advantage Human Resourcing, Inc., 2016 WL 344532, *7 (N.D. Cal. 2016) ("[A] clear sailing

21  provision does not signal the possibility of collusion where, as here, Class Counsel's fee will be

22  awarded by the Court from the same common fund as the recovery to the class.").  Finally, the

23  entire settlement amount will be distributed, and no funds will revert to defendant.  (See Dkt. 268-

24

25

---

26      [12] "In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a

27  negotiated ceiling."  In re Toys R Us, 295 F.R.D. at 458; see also Allen v. Bedolla, 787 F.3d 1218, 1224 (9th Cir. 2015) (noting that a clear sailing agreement is "an arrangement where defendant

28  will not object to a certain fee request by class counsel").

3, Settlement Agreement at ¶¶ 6.1.1-6.1.6).  In short, the court finds that the settlement is fair, reasonable, and adequate, and not the product of collusion among the parties.

        F.     Cy Pres Designee.

      The settlement provides that the residue of any un-cashed checks issued to class members will be distributed, subject to the court's approval, to the National Consumer Law Center ("NCLC"), as a cy pres recipient.  (See Dkt. 268-3, Settlement Agreement at ¶ 6.1.6).

      Courts may approve cy pres distributions if there is "a driving nexus between the plaintiff class and the cy pres beneficiaries."  Dennis v. Kellogg Co., 697 F.3d 858, 865 (9th Cir. 2012).  A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members, and must not benefit a group too remote from the plaintiff class[.]"  Id. (internal quotation marks and citations omitted).

      Here, plaintiff states that the NCLC is "guided by the objectives of this litigation (consumer protection against unfair and deceptive business practices)[.]" (Dkt. 268-1, Motion at 24).  Indeed, courts have repeatedly found the NCLC to have the requisite nexus with consumer classes for qualification as a cy pres recipient.  See, e.g., Johnson v. Gen. Mills, Inc., 2013 WL 3213832, *3 (C.D. Cal. 2013) (approving NCLC as cy pres designee); Tadepalli v. Uber Techs., Inc., 2015 WL 9196054, *10 (N.D. Cal. 2015) (same); Durham v. Cont'l Cent. Credit, Inc., 2011 WL 2173769, *2 (S.D. Cal. 2011) (same); Kelen v. World Fin. Network Nat'l Bank, 302 F.R.D. 56, 68 (S.D.N.Y. 2014) (same).  The court finds that NCLC's work with respect to consumer protection and unfair and deceptive acts and practices provides the requisite nexus to the interests of the class members, the nature of their claims, and the purpose of the underlying statutes, and thus qualifies as the next best distribution to the class.[13]

/ / /

/ / /

---

[13]  Accordingly, Ms. Branch's objection to the appointment of NCLC as the cy pres designee is without merit and is overruled.  (See Dkt. 264, Branch Obj. at ECF 8783-86).

1   II.      ATTORNEY'S FEES, COSTS AND SERVICE AWARD.

2          A.      Attorney's Fees.

3          The settlement provides that class counsel may apply to the court for an attorney's fee

4   award not to exceed 27% of the settlement amount, and costs of up to $500,000. (See Dkt. 268-3,

5   Settlement Agreement at ¶ 6.1.1.1).   In the Fees Motion, class counsel seek $13,500,000 in

6   attorney's fees (equaling 27% of $50,000,000) and $191,080.91 in costs. (See Dkt. 248-1, Fees

7   Motion at 1).

8          Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable

9   attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."

10  Fed. R. Civ. P. 23(h).  In diversity actions such as this one, the Ninth Circuit applies state law to

11  determine the right to fees and the method for calculating them.[14]  See Mangold v. Cal. Public Util.

12  Commc'n, 67 F.3d 1470, 1478 (9th Cir. 1995) ("Existing Ninth Circuit precedent has applied state

13  law in determining not only the right to fees, but also in the method of calculating the fees.");

14  Rodriguez v. Disner, 688 F.3d 645, 653 n. 6 (9th Cir. 2012) ("If . . . we were exercising our

15  diversity jurisdiction, state law would control whether an attorney is entitled to fees and the method

16  of calculating such fees.").

17         The California Supreme Court recently held that courts have discretion to choose among

18  two different methods for calculating a reasonable attorney's fee award.  See Laffitte v. Robert

19  Half Int'l Inc., 1 Cal.5th 480, 504 (2016).  "The choice of a fee calculation method is generally one

20

21         [14]  As plaintiff notes, the settlement in this case is not governed by CAFA's provision regarding
22  "coupon" settlements, see 28 U.S.C. § 1712(a), since class members have the option of selecting
    either a cash payment or a store credit, both of equal value, (see Dkt. 268-3, Settlement
23  Agreement at ¶ 6.1.2; see also Dkt. 248-1, Fees Motion at 10; Dkt. 266, Reply at 7-8), and the
    store credits: do not expire; may be used to purchase any product at a JCPenney store or its
24  website; will maintain a balance to be depleted on actual use; are transferable; are stackable; and
    may be used in connection with any promotion or discount.  (See Dkt. 248-1, Fees Motion at 10;
25  Dkt. 268-3, Settlement Agreement at ¶ 2.37); see also In re Online DVD-Rental Antitrust Litig., 779
26  F.3d at 949-52 (affirming district court holding that store gift cards did not constitute a coupon
    settlement because class members could choose between a cash payment or gift card of equal
27  value, the gift cards could be used on any item carried on the website of a giant retailer, class
    members did not need to spend any of their own money, the cards were transferable, and they
28  did not expire).

within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts."  Id.  "The lodestar method, or more accurately the lodestar-multiplier method, calculates the fee by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate.  Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented."  Id. at 489 (internal quotation marks omitted).

"The percentage method calculates the fee as a percentage share of a recovered common fund or the monetary value of plaintiffs' recovery."  Laffitte, 1 Cal.5th at 489.  This method is typically used when a common fund is created.  See id. at 502.  "Under the percentage method, California has recognized that most fee awards based on either a lodestar or percentage calculation are 33 percent and has endorsed the federal benchmark of 25 percent."  Smith v. CRST Van Expedited, Inc., 2013 WL 163293, *5 (S.D. Cal. 2013); see Chavez v. Netflix, Inc., 162 Cal.App.4th 43, 66 n. 11 (2008) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."); In re Consumer Privacy Cases, 175 Cal.App.4th 545, 557 n. 13 (2009) ("A fee award of 25 percent is the benchmark award that should be given in common fund cases.") (internal quotation and alteration marks omitted).

The "courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar."  Craft v. Cnty. of San Bernardino, 624 F.Supp.2d 1113, 1116-17 (S.D. Cal. 2008); see Laffitte, 1 Cal.5th at 504 (determining reasonableness of percentage fee "by obtaining additional information from class counsel on the risks and potential value of the litigation;" the "contingency, novelty and difficulty" of the case; and "the skill shown by counsel").  "As always, when determining attorneys' fees, the district court [is] guided by the fundamental principle that fee

1  awards out of common funds be reasonable under the circumstances." <u>Glass v. UBS Fin. Servs.,</u>

2  <u>Inc.</u>, 2007 WL 221862, *14 (N.D. Cal. 2007), <u>aff'd</u>, 331 F.App'x 452 (9th Cir. 2009) (internal

3  quotation marks and emphasis omitted).

4          1.      **The Result Obtained for the Class**.

5          "The result achieved is a significant factor to be considered in making a fee award." <u>In re</u>

6  <u>Heritage Bond Litig.</u>, 2005 WL 1594403, *19 (C.D. Cal. 2005); <u>see</u> <u>Hensley v. Eckerhart</u>, 461 U.S.

7  424, 436, 103 S.Ct. 1933, 1941 (1983) (holding that "the most critical factor is the degree of

8  success obtained").   As the court previously found, the settlement amount of $50,000,000 is

9  compelling given the substantial litigation risks in this case, including the real possibility that

10  plaintiff could recover nothing even if she prevailed on liability given the "risks with respect to each

11  of plaintiff's proposed measures of restitution." (<u>See</u> Dkt. 257, Court's Order of January 25, 2016,

12  at 21).   Indeed, plaintiff's results are exceptional given that there was an absence of precedent

13  involving a court awarding a monetary recovery to consumers for claims based on false price

14  comparisons. (<u>See</u> Dkt. 248-1, Fees Motion at 11).   In addition to the large monetary award, class

15  counsel secured non-monetary relief in the form of changed pricing policies, a compliance

16  program, and training for defendant's employees.  (<u>See</u> Dkt. 268-3, Settlement Agreement at ¶

17  6.1.7).   In light of the exceptional result achieved by class counsel for the class, the court finds that

18  the requested fee award is fair and reasonable.  <u>See</u> <u>Vizcaino v. Microsoft Corp.</u>, 290 F.3d 1043,

19  1046-50 (9th Cir.), <u>cert.</u> <u>denied</u>, 537 U.S. 1018 (2002) (affirming $27,127,800 in attorney's fees,

20  which was 28% of a $96,885,000 common fund, based in part on the finding that "counsel pursued

21  [the] case in the absence of supporting precedents").

22          2.      **Class Counsel's Expended Effort, Experience, and Skill Required**.

23          The "prosecution and management of a complex . . . class action requires unique legal

24  skills and abilities." <u>In re Omnivision Technologies, Inc.</u>, 559 F.Supp.2d 1036, 1047 (N.D. Cal.

25  2008).  Here, class counsel litigated this case with great skill and performed high quality work, as

26  reflected in the results obtained.  Class counsel have demonstrated their diligence in this action

27  as well as their experience litigating class action cases. <u>See</u> <u>supra</u> at § I.D.5.  This factor weighs

28  in favor of granting the requested fee.

3.    **Complexity of the Issues**.

"Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award." In re Heritage Bond Litig., 2005 WL 1594403, at *20.  One need only review the briefing filed with respect to defendant's motions to dismiss and summary judgment motions, along with plaintiff's motion for class certification, to readily conclude that the issues in this case were novel and complex, particularly as to plaintiff's proposed measures of restitution.  This factor weighs heavily in support of class counsel's requested fee.

4.    **Risk of Non-Payment**.

"Courts consistently recognize that the risk of non-payment or reimbursement of expenses is a factor in determining the appropriateness of counsel's fee award." In re Heritage Bond Litig., 2005 WL 1594403, at *21.  Here, class counsel took the risk that they would never be paid for their time or reimbursed for costs.  (See Dkt. 248-1, Fees Motion at 16-17; Dkt. 248-2, Zevin Fees Decl. at ¶16; Dkt. 248-3, Declaration of Derek J. Emge in Support of Unopposed Motion for Attorneys' Fees, Litigation Costs and Class Representative's Enhancement Payment ("Emge Fees Decl.") at ¶ 14; Dkt. 248-4, Declaration of David A. Huch in Support of Unopposed Motion for Attorneys' Fees, Litigation Costs and Class Representative's Enhancement Payment ("Huch Fees Decl.") at ¶¶ 16-17).  The contingent nature of the work performed by class counsel here, including the risk they took in advancing costs, also weighs in favor of granting the fee request.  See Graham v. DaimlerChrysler Corp., 34 Cal.4th 553, 580 (2004) ("A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services."); Barbosa, 297 F.R.D. at 449 ("Like this case, where recovery is uncertain, an award of one-third of the common fund as attorneys' fees has been found to be appropriate.").

5.    **Reaction of the Class**.

The reaction of the class to the settlement has been positive.  As previously noted, only 809 class members requested exclusion, (see Dkt. 268-5, Prutsman Decl. at ¶ 32), which is 0.014% of those who received notice, (see Dkt. 268-1, Motion at 15), and only seven class members filed objections to the settlement, (see Dkt. 268-5, Prutsman Decl. at ¶ 33), which represents 0.0001%

of those who received notice of the settlement.  (See Dkt. 268-1, Motion at 15).  The positive reaction of the class members supports the fee application.

              6.  **Lodestar Cross-Check**.

      "One way that a court may demonstrate that its use of a particular method or the amount awarded is reasonable is by conducting a cross-check using the other method."  In re Online DVD-Rental Antitrust Litig., 779 F.3d at 949; see Laffitte, 1 Cal.5th at 504 (holding that the court has discretion to "double check the reasonableness of the percentage fee through a lodestar calculation").  "For example, a cross[-]check using the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate."  In re Online DVD-Rental Antitrust Litig., 779 F.3d at 949 (internal quotation marks omitted); see Laffitte, 1 Cal.5th at 504 ("If a comparison between the percentage and lodestar calculations produces an imputed multiplier far outside the normal range, indicating that the percentage fee will reward counsel for their services at an extraordinary rate even accounting for the factors customarily used to enhance a lodestar fee, the trial court will have reason to reexamine its choice of a percentage.").  Thus, although not required, a lodestar cross-check may assist the court in evaluating the reasonableness of the instant attorney's fees request.

      In conducting the cross-check, the court need not "closely scrutinize each claimed attorney-hour, but [may] instead use[] information on attorney time spent to focus on the general question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys."  Laffitte, 1 Cal.5th at 505 (internal quotation marks omitted); see Barbosa, 297 F.R.D. at 451 ("Where the lodestar method is used as a cross-check to the percentage method, it can be performed with a less exhaustive cataloguing and review of counsel's hours.").  Here, having reviewed counsel's submissions in connection with their Fee Motion, the court finds that their $4,399,095.50 lodestar is reasonable given the work performed in this matter and the prevailing rates in the community for lawyers of comparable skill, experience, and reputation.  (See Dkt. 266, Reply at 2; Dkt. 248-2, Zevin Fees Decl. at ¶¶ 18-19; Dkt. 248-3, Emge Fees Decl. at ¶¶ 12-13; Dkt. 248-4, Huch Fees Decl. at ¶¶ 10 & 15; Dkt. 266-1, Supplemental Declaration of Derek J. Emge in Support of Motion for Attorneys' Fees, Litigation Expenses and Class Representative

1    Enhancement Payment at ¶¶ 4-6; Dkt. 266-10, Supplemental Declaration of Matthew J. Zevin in

2    Support of Motion for Attorneys' Fees, Litigation Costs and Class Representative's Enhancement

3    Payment at ¶¶ 4-8; Dkt. 266-11, Supplemental Declaration of David A. Huch in Support of

4    Unopposed Motion for Attorneys' Fees, Litigation Costs and Class Representative's

5    Enha[n]cement Payment at ¶¶ 4-6; see also Dkt. 248-1, Fees Motion at 17-20).   Counsel's

6    lodestar yields a 3.07 multiplier, which is well within the range for reasonable multipliers.  See

7    Vizcaino, 290 F.3d at 1052-1054 (surveying multipliers in 23 class action suits and recognizing

8    that courts applied multipliers of 1.0 to 4.0 in 83% of surveyed cases); Parkinson v. Hyundai Motor

9    Am., 796 F.Supp.2d 1160, 1170 (C.D. Cal. 2010) (observing that "multipliers may range from 1.2

10   to 4 or even higher"); Hopkins  v. Stryker Sales Corp., 2013 WL 496358, *4 (N.D. Cal. 2013)

11   ("Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases.").

12   Thus, the lodestar cross-check further supports the attorney's fees request.  See Laffitte, 1 Cal.5th

13   at 496 ("If the implied multiplier is reasonable, then the cross-check confirms the reasonableness

14   of the percentage-based fee[.]").

15            7.    **Conclusion**.

16           Consideration of the foregoing factors supports the request for attorney's fees.  In sum,

17   under the circumstances, the requested fee award out of the common fund established by the

18   Settlement Agreement is fair and reasonable.

19           B.     Costs.

20           The Settlement Agreement provides that class counsel may seek reimbursement of

21   litigation costs of up to $500,000.  (See Dkt. 268-3, Settlement Agreement at ¶ 6.1.1.1).  Here,

22   class counsel have incurred $191,080.91 in costs.  (See Dkt. 248-1, Fees Motion at 21-22; Dkt.

23   266, Reply at 13; Dkt. 248-2, Zevin Fees Decl. at ¶¶ 20-21 (setting forth costs and expenses

24   incurred); Dkt. 248-3, Emge Decl. at ¶ 15 (same)).  The court finds that the costs incurred by class

25   counsel over the course of this litigation are reasonable, and therefore awards a total of

26   $191,080.91 in costs to be paid out of the settlement fund.

27

28

C.    <u>Class Representative Enhancement Award</u>.

Class counsel request that the court grant plaintiff an enhancement award in the amount of $10,000.  (<u>See</u> Dkt. 248-1, Fees Motion at 22-25; Dkt. 268-3, Settlement Agreement at ¶ 6.1.1.2).  In its Order of January 25, 2016, the court undertook a thorough examination of the fairness and adequacy of the incentive payment at issue, applying the careful scrutiny required in this Circuit.  (<u>See</u> Dkt. 257, Court's Order of January 25, 2016, at 24-26); <u>see also</u> <u>Radcliffe v. Experian Info. Solutions Inc.</u>, 715 F.3d 1157, 1163 (9th Cir. 2013) (reversing the district court's class action settlement approval and instructing "district courts to scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives").  Based on its review of the record, the court determined that the award was appropriate.  (Dkt. 257, Court's Order of January 25, 2016, at 26).  The court therefore concludes that the requested enhancement payment is fair and reasonable, and is hereby approved.

<u>**CONCLUSION**</u>

Based on the foregoing, IT IS ORDERED THAT:

1.  Plaintiff's Motion for Final Approval of Class Action Settlement **(Document No. 268)** is **granted** as set forth herein.

2.  The court hereby **grants final approval** of the parties' Settlement Agreement ("Settlement Agreement") **(Document No. 268-3)**.  The court finds that the settlement is fair, adequate, and reasonable, appears to be the product of arm's length and informed negotiations, and treats all members of the class fairly.  The parties are ordered to perform their obligations pursuant to the terms of the Settlement Agreement and this Order.

3.  Plaintiff's Unopposed Motion for Attorneys' Fees, Litigation Costs and Class Representative's Enhancement Payment **(Document No. 248)** is **granted** as set forth herein.

4.  The settlement class is certified under Federal Rule of Civil Procedure 23(c): All members of the class preliminarily approved on January 25, 2016, who did not properly and timely request exclusion pursuant to the procedures specified in the Settlement Agreement.

5.  The form, manner, and content of the Class Notice meet the requirements of Federal Rules of Civil Procedure 23(c)(2).

6.  The court affirms the appointment of plaintiff Cynthia E. Spann as class representative.

7.  The court affirms the appointment of Stanley Law Group and Emge Firm, LLP as class counsel.

8.  Plaintiff Cynthia E. Spann shall be paid a service payment of $10,000 in accordance with the terms of the Settlement Agreement.

9.  Class counsel shall be paid $13,500,000 in attorney's fees and $191,080.91 in costs in accordance with the terms of the Settlement Agreement.

10.  The settlement administrator, Heffler Claims Group LLC, shall be paid up to $2,667,000 for its fees and expenses in connection with the administration of the Settlement Agreement, in accordance with the terms of the Settlement Agreement.

11.  The court approves the designation of the National Consumer Law Center as the <u>cy pres</u> beneficiary of any unclaimed settlement funds pursuant to the Settlement Agreement.

12.  All class members who did not validly and timely request exclusion from the settlement have released claims against defendant, as set forth in the Settlement Agreement.

13.  Except as to any class members who have validly and timely requested exclusion, this action is **dismissed with prejudice**, with all parties to bear their own fees and costs except as set forth herein and in the prior orders of this court.

14.  Without affecting the finality of this Order in any way, the court hereby retains jurisdiction over the parties, including class members, for the purpose of construing, enforcing, and administering the order and Judgment, as well as the Settlement Agreement itself.

15.  Judgment shall be entered accordingly.

Dated this 30th day of September, 2016.

                                             /s/
                              _____
                                    Fernando M. Olguin
                              United States District Judge